

# SUPREME COURT OF MISSOURI
## en banc

RICHARD E. IVIE, JIMMIE R. IVIE,        )
LADONNA SMALL, AND BERNARD IVIE,  )
                                 )
            Respondents,        )
                                 )
      v.                    )        No. SC93872
                                 )
ARNOLD L. SMITH AND        )
SIDNEY B. SMITH,          )
                                 )
            Appellants.         )

### APPEAL FROM THE CIRCUIT COURT OF SCOTT COUNTY
The Honorable Benjamin Frederick Lewis, Judge

### Opinion issued July 8, 2014

Arnold and Sidney Smith (collectively, "Smith") appeal the circuit court's judgment declaring changes to an estate plan void due to lack of testamentary capacity and undue influence. Patricia Watson created a trust in 2002, which left substantially all of her property to her half siblings. The trust expressly excluded Arnold Smith, her husband. Several years later, after Watson's mental health had deteriorated, Watson signed two separate amendments to her trust, signed changes to beneficiary designations on her bank accounts and retirement accounts, and signed documents retitling several of her accounts and vehicles. The effect was that almost all of Watson's personal property passed to Smith when Watson died. Her half siblings sued and prevailed in a court-tried case. Because this Court holds that the circuit court's judgment that Watson lacked

capacity is supported by the record and is not against the weight of the evidence, there is no need to address the undue influence claims. The circuit court's judgment is affirmed.

## Factual and Procedural Background[1]

Watson, the decedent, was raised in Missouri. Early in life, she took a job teaching elementary school in the state of California. Despite the distance, she retained close ties with her half siblings, Richard Ivie, Jimmie Ivie, Ladonna Small, and Bernard Ivie ("the Ivies"). Watson had three previous husbands before she married Smith, and she had only one child, a daughter who was murdered in 1980.

Watson retired from teaching in February 2002, and she married Smith on February 20, 2002, in California. At the time of their marriage, Watson was 70 years old and Smith was 60 years old. Watson had substantial income and approximately $1 million in assets. This included her home in California, several parcels of real estate in southeast Missouri, a pension from the California State Teachers' Retirement System (CALSTRS), and several bank accounts, retirement accounts, and vehicles. Smith, on the other hand, had filed for bankruptcy in 1997 and had minimal income and assets. The two lived together in Watson's California home until moving to Missouri in 2004.

## Watson's Original Trust

Watson created her original trust on May 9, 2002, about three months after marrying Smith. At the same time, Watson also created a will with a provision "pouring over" all of her estate's assets into the trust. Although they were living in California at the time, Watson's Missouri attorney, Reginald Young, prepared the documents.

---

[1] Much is drawn from the court of appeals' opinion without further attribution.

Watson wanted the trust to own all of her property so she could retain control over it. Both Watson and Smith signed deeds conveying all of Watson's real estate to the trust. When they moved back to Missouri, they placed the proceeds from the sale of the California home in the trust and deeded the new Missouri home to the trust. The trust also owned or was the beneficiary of several of Watson's bank and retirement accounts.

The Ivies were the sole beneficiaries of the trust. Under its original terms, the Ivies were to divide the trust assets and proceeds equally. The trust also stated: "It is expressly the Grantor's intention that her husband, Arnold L. Smith, not receive any part of the Trust Estate."

### Events Leading Up to the First Trust Amendment

Watson began showing signs that her mental heath was progressively deteriorating long before signing an amendment to the trust for the first time on July 27, 2007. As early as January 2003, she saw a physician for physical ailments. The physician noted in his report: "She thinks her husband is trying to poison her with rat poison. She denies hallucinations, but apparently gets very angry quickly on questioning. . . . At this time the patient seems to have paranoia."

Watson and Smith moved to Missouri in late 2004. Around this time, Watson told her sister that she was having trouble remembering words and names. According to her sister, Watson wanted a divorce from Smith because he had ruined her life. Watson also told one of her brothers that she thought she was losing her mind, that she was afraid of Smith, and that she thought he was trying to poison her.

3

Watson visited several physicians in 2005, complaining in part about memory loss. Early in 2005, one of her physicians prescribed Namenda, a drug used to treat moderate to severe dementia.[2] She persisted in her belief that Smith was trying to poison her. Another physician noted that she was "perhaps somewhat paranoid" but ordered poisoning tests anyway. Although she accepted that the results were within normal limits, she maintained that she had been poisoned for the previous four years.

Watson had a neuro-psychological evaluation at the Mayo Clinic in October 2005. She told the physicians she had trouble with forgetfulness and that she could not think. She reported that, since her daughter had been killed in 1980, "I haven't been the same." According to the physician's report, Smith told the physician that Watson's word-finding abilities had gradually worsened over the prior six months. Smith also told the physician that Watson had trouble following instructions and remembering things, trouble with misplacing things, disorganization in thinking, and loss of train of thought mid-conversation. In addition, Smith mentioned that Watson had trouble managing her checkbook and that she had allowed him to take over. During testing procedures, Watson was impatient with long instructions, which often needed to be simplified so she could understand.

The test results showed "a mild to moderate degree of cognitive impairment," which "likely" reflected an abnormality that had appeared on brain imaging tests. The report stated that Watson would "require continued supervision and assistance with complex activities of daily living, including assistance with any medical, legal, or

---

[2] The medical records do not reflect whether she ever actually took Namenda.

4

financial decision-making." The Mayo Clinic physician concluded that Watson's condition was most consistent with a diagnosis of vascular dementia. He recommended ongoing monitoring because he could not rule out a "neurodegenerative process."

As time passed, it became apparent that Watson's mental condition was getting worse. She began seeing a new physician in March 2006, complaining in part about progressive problems with short-term memory. Although Watson's only child had been murdered in 1980, she apparently told the physician she had "[o]ne child, alive and well." The same physician diagnosed probable Alzheimer's dementia in October 2006 and stated without qualification in November 2006 that the diagnosis was Alzheimer's dementia. He prescribed her Aricept, which is used to treat Alzheimer's disease.

Before Watson executed the first trust amendment, she was no longer able to care for herself and was dependent on help from others. She needed help with all of her daily living activities, including walking, bathing, dressing, preparing meals, using the telephone, driving, getting in and out of the car, and walking up and down stairs. By May 2007, at a family gathering, Watson did not recognize the children of one of her brothers and other previously known family members.

Soon after, she went to the hospital for physical problems. The hospital records show that on June 25, 2007, she was "confused" and "oriented to self only," that she was non-responsive to the nurses' attempts to orient her "to time and place," and that she made inappropriate statements suggesting impaired memory. The treating physician diagnosed her with "[m]ild dementia, probably Alzheimer's disease" and recommended increasing her Aricept prescription. He also recommended further testing and suggested

5

supplementing with Namenda if the dementia worsened. She left the hospital June 29, 2007.

### The First Trust Amendment

On July 10, 2007, Watson had a meeting with her attorney, Young, about executing a power of attorney. Her sister testified that Watson understood what was going on at that meeting. Apparently, Watson told the Ivies at some point that she was going to give them each $25,000. Roughly one month after leaving the hospital, on July 27, 2007, Watson signed the first trust amendment decreasing the Ivies' share of her property and granting Smith a share. Each of the Ivies would now receive $25,000 upon her death. Smith would receive the remainder. The amendment also added a "no-contest" clause, because of an apparent conflict between Smith and the Ivies, the purpose of which was to cause anyone challenging the trust to lose his or her share.

Watson's attorney, Young, prepared the amendment. According to Young, Watson had spoken with him several times in July leading up to the signing of the first trust amendment, both on the telephone and in person. Young testified that Watson had changed her mind about not including Smith in the trust since their marriage five years before because she realized Smith would receive nothing when she died. He also testified that Watson understood what was going on and that, by amending the trust, she was leaving most of her property to Smith. However, Young did not know she had been

6

diagnosed with dementia. He admitted at trial that, had he known about the diagnosis, it would have caused concern.[3]

### Changes to Bank Accounts and Retirement Accounts

Watson's mental health continued to worsen. At some point after July 2007, she visited one of her neighbors and took off her own clothes in the neighbor's living room. She began receiving in-home nursing care in November 2007. The nurses' reports reflect that Watson's dementia was uncontrolled, she answered questions inappropriately and changed the subject frequently, she was paranoid and became very upset when she could not find something, she cried at inappropriate times, and she experienced forgetfulness and mood swings. At the physicians' office in early January 2008, Smith filled out the intake form for "thinking or memory problems." He circled "yes" for each of these conditions:

> Problems with judgment (problems making decisions, bad financial decisions, problems with thinking, etc.); Less interest in hobbies/activities; Trouble learning how to use a tool, appliance, or gadget (VCR, computer, microwave, remote control, etc.); Forgets correct month or year; Trouble handling complicated financial affairs (balancing checkbook, income taxes, paying bills, etc.); Trouble remembering appointments; Daily problems with thinking or memory.

From early December 2007 to mid-January 2008, Watson signed changes to several of her bank accounts and retirement accounts. She retitled her checking account and money market account from the trust to her own name individually and signed documents to "pay on death" to Smith. Watson transferred funds from a certificate of

---

[3] Although Young testified that Watson signed the trust amendment in his presence, Young's billing records do not affirmatively indicate that he was physically present on the date of signing.

deposit (CD) owned by the trust to a new savings account opened in her name individually, also with a pay-on-death designation in favor of Smith. And for two of her individual retirement accounts (IRAs), Watson signed changes in the beneficiary designations in favor of Smith, which previously designated the trust (for one account) and the Ivies (for the other).[4]

### The Second Trust Amendment

Watson's nurses chronicled her worsening mental condition beginning in January 2008 and leading up to the date of execution of the second trust amendment. The in-home nursing staff noted that her forgetfulness continued and that she had bouts of confusion. The following are a few examples. In late January, she asked Smith, "Am I still your wife? Are we married?" In late March, she was disoriented in her home and could not find the bathroom. In April, she wanted her lawn hand-pulled instead of mowed. In May, she was hospitalized after falling, and the "fall risk assessment" on the hospital reports repeatedly showed that she was "Confused/Disoriented/Senile/Irrational/ Non-Compliant." On June 5, back at home, Watson said that she saw a baby while staring at the ceiling and that she was hearing voices.

Watson lived in a nursing home from June 9, 2008, until July 2, 2008, which was the day she signed the second trust amendment. The nursing home records show that Watson was confused and disoriented throughout her stay. On June 9, she "seemed confused about where she was and about her husband, her home and finances." The next

---

[4] In October 2008, she also transferred funds from the second of these IRAs to a new IRA, which also named Smith as the beneficiary. The Court will refer to these various bank accounts and retirement accounts collectively, as "accounts."

8

day, when the nurse performed a finger stick, Watson asked if her hand would grow back, which the nurse considered a sincere question. On June 30, she was "confused to time and place." On July 2, although Watson was oriented as to who she was and where she was, the nurse's report states that she was still "[c]onfused to time." That same day, Watson signed the second trust amendment after leaving the nursing home.

The second trust amendment, which Young also prepared, further reduced the Ivies' shares in the trust estate and increased Smith's share. Now instead of $25,000, each of the Ivies would receive $5,000. In addition, Smith's son from a previous marriage, Sydney Smith, was included to receive $5,000, and the step-daughter of one of Watson's brothers was included to receive $5,000. Smith would receive the remainder. Because Young recognized that Watson's mental health had deteriorated and because he anticipated controversy over the changes to Watson's estate plan, he prepared a memorandum for his file stating that he believed she understood what she was doing. However, Young had never reviewed any of Watson's medical records and did not seek a medical opinion before helping her finalize the amendment.[5]

---

[5] Young testified as follows:

Q. And it's also true you had not reviewed any medical records before Ms. Watson signed her first amendment on 7/27/07, correct?

A. I don't think I've ever reviewed any medical records of Patricia.

. . . .

Q. Okay. So your testimony it [sic] would not be the prudent thing to do if you had questions about capacity to get a doctor's opinion? You decide that yourself?

A. No, I'm not saying it wouldn't be prudent, but in this case I didn't know about the dementia diagnosis. (Tr. 323, 329.)

9

**Changes to Watson's Pension and Retitling of Vehicles**

Shortly after Watson signed the second trust amendment, Smith started obtaining "affidavits of incapacity" signed by five physicians. Each of the five affidavits was a standard form supplied by Smith, and each stated the following:

> Patricia P. Watson . . . is, by reason of advanced age, physical incapacity or mental weakness, incapable of managing . . . her own estate; lacks mental capacity to enter into a binding agreement or make decisions on . . . her own behalf; [and] does not have the ability to understand that a contract is being made and its general nature.

The first affidavit was executed July 22, 2008. The other affidavits were executed by four different physicians the following August, September, and February.

On July 24, 2008, two days after the first affidavit of incapacity was signed, Smith filled out a change-of-beneficiary form for Watson's pension from CALSTRS, and Watson signed it. This reduced Watson's during-life payments from her pension in exchange for survivor benefits for Smith.

In December 2008, Watson and Smith met with a new attorney, Clayton Vandivort, for the purpose of retitling more of Watson's property. Vandivort did not recognize that Watson had any mental impairment. For each of her vehicles, Smith was added as either a joint title holder or a transfer-on-death beneficiary.[6] Watson died April 10, 2009.

---

[6] Although they also attempted to retitle her real estate, this was not accomplished.

10

## Circuit Court Proceedings and Procedural History

After Watson's death, the Ivies filed this action seeking to set aside the trust amendments, beneficiary designations, and various property transfers.[7] Among the many witnesses at trial, Smith, Young, the Ivies, and two medical experts testified. The experts gave conflicting testimony.

The Ivies' expert was Dr. Adam Sky, a geriatric psychiatrist. Based on his review of Watson's medical records as a whole, it was his opinion, to a 90-percent degree of certainty, that Watson had a progressive form of dementia. He testified that Watson did not have testamentary capacity at any time after July 1, 2007, and that she was incapacitated when each of the changes to her estate plan was made. He also testified that it was possible that Watson appeared to her attorneys to have testamentary capacity when she actually did not.

Smith's expert, Dr. Randall Huss, a medical doctor board-certified in geriatric medicine, also reviewed Watson's medical records. He agreed that Watson's condition was progressive but testified that people with dementia can have lucid moments. Dr. Huss's opinion was that Watson had testamentary capacity when she made the changes to her estate plan. He based his opinion in part on the testimony of Watson's attorneys that Watson knew what she was doing each time she made a change.

The circuit court entered judgment for the Ivies. In its findings of fact and conclusions of law, the circuit court expressly found the testimony of Dr. Sky credible

---

[7] The Ivies filed two separate lawsuits seeking the same relief, one of which was filed in Smith's probate proceedings. The two lawsuits were consolidated for trial.

and expressly found the testimony of Smith, Young, and Dr. Huss not persuasive. Smith was found not credible because he repeatedly denied the assertions about Watson's mental health in the physicians' and nurses' reports, even though Smith himself reported many of Watson's mental impairments. The circuit court considered Young's testimony not persuasive because he was unaware of Watson's medical records when he assisted her in preparing the trust amendments.[8]

The circuit court found by clear and convincing evidence that (1) Watson lacked testamentary capacity with regard to all of the changes to her estate plan and (2) the changes were the product of Smith's undue influence. In support of its conclusion, the circuit court stated the following:

> The conclusion that Patricia lacked of [sic] testamentary capacity . . . [is] not dependent on any one or even any number of the many facts found in this judgment. The evidence of Patricia's lack of testamentary capacity was overwhelming . . . .

The circuit court ruled that both trust amendments, the changes to beneficiary designations, and the property transfers were void. Its judgment directed that the CALSTRS pension benefit go directly to the Ivies and directed that the other non-trust assets go to Watson's probate estate. This Court ordered transfer after the court of appeals issued an opinion and, therefore, has jurisdiction. *See* Mo. Const. art. V, § 10; Rule 83.04.

---

[8] The circuit court also found that Young's memory of the first trust amendment was unreliable and that his file, his billing records, and the estate plan documents indicated that Young was not actually physically present when Watson signed the first amendment to the trust.

## Standard of Review

On review of a court-tried case, an appellate court will affirm the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The same standard of review applies in all types of court-tried cases[9] regardless of the burden of proof at trial.[10] *In re J.A.R.*, 426 S.W.3d 624, 626 n.4, 631 (Mo. banc 2014).

## Analysis

Smith argues that the circuit court's judgment of incapacity and undue influence is not supported by substantial evidence, is against the weight of the evidence, and misapplies the law.[11] This Court holds that substantial evidence supports the circuit court's judgment that Watson lacked testamentary capacity to make the changes to her estate plan and that the judgment was not against the weight of the evidence. The Court

---

[9] Prior statements from this and other Courts to the effect that greater deference is paid to the trial court in certain types of cases (e.g., family law) than in others are incorrect and misleading. Those prior statements should not be read to mean anything more than that such cases often require the trial court to weigh a great deal of conflicting evidence before finding the highly subjective facts required by the applicable statutory factors.

[10] The Ivies concede that their burden of proving Watson's incapacity was proof by clear, cogent, and convincing evidence. (Respondents' Br. at 63.) Because the parties have not briefed the burden of proof issue, this Court simply presumes, without deciding, that the Ivies are correct that they bore the burden of proving Watson's incapacity, as contestants, and that their burden was proof by clear, cogent, and convincing evidence.

[11] In several instances, Smith's appellate brief combines into the same point relied on a substantial-evidence challenge, a misapplication-of-law challenge, and an against-the-weight-of-the-evidence challenge. These are distinct claims. *See In re J.A.R.*, 426 S.W.3d at 630 n.10; *Pearson v. Koster*, 367 S.W.3d 36, 43 (Mo. banc 2012); *Murphy*, 536 S.W.2d at 32. They must appear in separate points relied on in the appellant's brief to be preserved for appellate review. Rule 84.04; *see In re J.A.R.*, 426 S.W.3d at 630 n.10. This Court will gratuitously address the merits of Smith's claims. Appellate counsel should take caution to follow Rule 84.04(d).

further holds that, although the circuit court misapplied the law regarding the level of mental capacity required to change beneficiary designations, the circuit court's error was not prejudicial because the mental capacity required to make a contract is greater than the "testamentary capacity" standard applied by the circuit court. Rule 84.13(b) (stating that no appellate court shall reverse a judgment unless the circuit court committed an error "against the appellant materially affecting the merits of the action"). Because the findings of incapacity are sufficient to sustain the circuit court's judgment, this Court need not address the additional claims of undue influence.[12] *See Roberts v. BJC Health Sys.*, 391 S.W.3d 433, 437 (Mo. banc 2013) ("[A]ny trial court judgment[] can be affirmed on appeal by any appropriate theory supported by the record.").

## I.    Standard of Review for Substantial-Evidence Challenges

Substantial evidence is evidence that, if believed, has some probative force on each fact that is necessary to sustain the circuit court's judgment. *See In re K.A.W.*, 133 S.W.3d 1, 9 (Mo. banc 2004). Evidence has probative force if it has any tendency to make a material fact more or less likely. *See Kansas City v. Keene Corp.*, 855 S.W.2d 360, 367 (Mo. banc 1993). When reviewing whether the circuit court's judgment is supported by substantial evidence, appellate courts view the evidence in the light most favorable to the circuit court's judgment and defer to the circuit court's credibility determinations. *In re J.A.R.*, 426 S.W.3d at 626, 631-32 & n.14. Appellate courts

---

[12] Smith also argues, apparently in the alternative, that if this Court were to hold that only the second trust amendment was void, the no-contest clause in the first amended trust would prevent the Ivies from recovering their specified shares of $25,000 each. Because this Court affirms the circuit court's judgment that both trust amendments were void, the no-contest clause in the first amended trust has no effect.

14

"'accept as true the evidence and inferences . . . favorable to the trial court's decree and disregard all contrary evidence.'" *Zweig v. Metro. St. Louis Sewer Dist.*, 412 S.W.3d 223, 231 (Mo. banc 2013). In addition, this Court has made clear that no contrary evidence need be considered on a substantial-evidence challenge, regardless of whether the burden of proof at trial was proof by a "preponderance of the evidence" or proof by "clear, cogent, and convincing evidence." *In re J.A.R.*, 426 S.W.3d at 626 n.4, 631; *In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 815 (Mo. banc 2011).

Circuit courts are free to believe any, all, or none of the evidence presented at trial. *In re J.A.R.*, 426 S.W.3d at 627. The circuit court in this case made extensive findings of fact and conclusions of law. In addition, Rule 73.01 provides that "all fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." *Id.* at 626.

## II. The Circuit Court's Finding That Watson Lacked Testamentary Capacity as to the Trust Amendments Is Supported by Substantial Evidence

To prevail on the substantial-evidence challenge, Smith must demonstrate that there is no evidence in the record tending to prove a fact that is necessary to sustain the circuit court's judgment as a matter of law. *See In re J.A.R.*, 426 S.W.3d at 626-27; *In re K.A.W.*, 133 S.W.3d at 9. Smith's claim fails because he has mischaracterized what factual findings are necessary to sustain a finding of incapacity and because he has ignored this Court's standard of review.

The capacity required to make or amend a revocable trust is the same as that required to make a will—"testamentary capacity." Section 456.6-601, RSMo Supp.

15

2013; *Lewis v. McCullough*, 413 S.W.2d 499, 505 (Mo. 1967). A person has testamentary capacity if the person is at least 18 years of age, or emancipated, and is of sound mind. Section 474.310, RSMo 2000. A person is of sound mind if he or she (1) understands the ordinary affairs of life, (2) understands the nature and extent of his or her property, (3) knows the persons who are the natural objects of his or her bounty, and (4) understands that, by executing the instrument, he or she is giving property to persons in the manner specified in the instrument. *Lewis*, 413 S.W.2d at 505; *Gardine v. Cottey*, 230 S.W.2d 731, 746 (Mo. banc 1950); MAI-Civil 15.01 ("Sound and Disposing Mind and Memory").[13] A will or trust is deemed void if the person making it lacked sound mind at the time of execution. *See Watson v. Watson*, 562 S.W.2d 329, 331 (Mo. banc 1978).

Smith argues that the circuit court's judgment cannot be sustained because the Ivies were required to submit evidence of some observation of Watson's lack of testamentary capacity that occurred on the precise date the trust was amended. Smith has mischaracterized the law. It is true that there must be evidence tending to prove that testamentary capacity was not present at the time the will or trust was executed.

---

[13] "The phrase 'sound and disposing mind and memory' as used in this [these] instruction[s] means that when a person signs a [will] [codicil] that person:

First, was able to understand the ordinary affairs of life, and

Second, was able to understand the nature and extent of that person's property, and

Third, was able to know the persons who were the natural objects of that person's bounty, and

Fourth, could intelligently weigh and appreciate that person's natural obligations to those person's [sic]."

16

*Ambruster v. Sutton*, 244 S.W.2d 65, 72 (Mo. 1951). In addition, this Court has held that a treating physician's testimony that a testator was mentally unsound most but not all of the time prior to executing a will is insufficient alone to sustain a finding that the testator lacked testamentary capacity. *Smith v. Fitzjohn*, 188 S.W.2d 832, 143-44 (Mo. banc 1945). However, evidence of mental unsoundness either before or after execution, which is not too remote, is admissible to prove lack of testamentary capacity, as long as the evidence indicates the unsoundness existed at the time the will or trust was made. *Id.* at 143; *Ambruster*, 244 S.W.2d at 72.

Here, the Ivies presented evidence at trial tending to prove Watson lacked testamentary capacity at the time both trust amendments were made. Dr. Sky testified that Watson did not have testamentary capacity at *any* point after July 1, 2007, which was before the first trust amendment was signed. The circuit court was free to believe this testimony and conclude that, at the time Watson executed both trust amendments on July 27, 2007, and July 2, 2008, she did not meet any one of the four conditions required to have testamentary capacity: that she understood the ordinary affairs of her life, understood what property she owned, knew who her relatives were, and understood that executing a trust amendment would change the disposition of her property when she died. *See Lewis*, 413 S.W.2d at 505; *Ambruster*, 244 S.W.2d at 72. Therefore, substantial evidence supports the circuit court's judgment that both trust amendments were void.

Smith contends that the court of appeals' decisions in *Hahn v. Tanksley*, 317 S.W.3d 145, 153-55 (Mo. App. 2010), and *Morse v. Volz*, 808 S.W.2d 424, 430-32 (Mo. App. 1991), "discounted" this type of evidence for proof of lack of testamentary capacity.

17

The court of appeals in *Morse* merely "confirm[ed] the accepted rule that evidence of the sickness, old age and eccentric conduct of a testator, taken alone, do not suffice to overthrow a will on the ground of mental incapacity." 808 S.W.2d at 430. The court of appeals reversed the circuit court's submission of the issue of testamentary capacity to the jury, noting that the contestant's expert witness could not say that the testator was "uniformly and consistently affected by" the mental defect. *Id.* at 431. In contrast, Dr. Sky definitively testified in this case that Watson lacked testamentary capacity at all points after July 1, 2007.

The court of appeals in *Hahn*, on the other hand, affirmed the circuit court's finding that testamentary capacity was present. 317 S.W.3d at 156. It reached this conclusion after deferring to the circuit court's credibility determinations in accordance with the substantial-evidence standard of review. *Id.* at 153-55. *Hahn* did not hold that medical evidence is insufficient to prove lack of testamentary capacity as a matter of law. It stands only for the proposition that the appellate court defers to the circuit court's resolution of conflicting evidence. *See id.*

Although the testamentary capacity standard takes into account the ability of persons who have been diagnosed with some form of mental defect to make a valid will or trust, it is the circuit court's function and responsibility to determine the factual issue of whether a person had testamentary capacity at the particular time of execution. In addition, if evidence of lack of testamentary capacity on the precise date of execution were required as a matter of law, a contestant could not prevail in the most egregious case—a person who has successfully concealed his or her exertion of power over the

18

victim would need only to hide him or her from others on the date of execution. The circuit court is in the best position to decide precisely when a person has testamentary capacity, and this Court defers to its findings.

Smith's arguments rely primarily on the testimony of Young, which the circuit court found not persuasive, as well as other evidence that was contrary to the result reached by the circuit court. These arguments ignore not only this Court's standard of review, but also the principle that the circuit court is free to believe all, part, or none of the evidence. *In re J.A.R.*, 426 S.W.3d at 631. Smith's failure to consider this Court's standard of review makes his challenge to the circuit court's finding of incapacity of no analytical or persuasive value. *See id.* at 632. Dr. Sky's testimony that Watson lacked testamentary capacity at all times after July 1, 2007, has a tendency to prove Watson lacked testamentary capacity at the time each trust amendment was made. Even in the absence of Dr. Sky's testimony, there was considerable other evidence of her incapacity both before and after the amendments from which the circuit court would be permitted to draw an inference of incapacity on the date in question. Therefore, the circuit court's judgment that they were void is supported by substantial evidence.

## III. Contractual Capacity is Required to Create Beneficiary Designations

Smith next argues that the circuit court erred by invalidating the various changes to beneficiary designations on Watson's accounts, CALSTRS pension, and vehicles because incapacity is not a basis for declaring a beneficiary designation void. Because "beneficiary designations" are governed by the Missouri Nonprobate Transfers Law, this point raises a question of statutory interpretation. Chapter 461, RSMo Supp. 2013. This

19

Court reviews questions of statutory interpretation *de novo*. *In re Brockmire*, 424 S.W.3d 445, 446-47 (Mo. banc 2014).

Section 461.054.1, RSMo 2000, states the following: "A beneficiary designation or a revocation of a beneficiary designation that is procured by fraud, duress or undue influence is void." A beneficiary who willfully and unlawfully causes the decedent's death is also disqualified from taking. Section 461.054.2, RSMo 2000. Smith contends that, because § 461.054 does not expressly list lack of capacity, beneficiary designations cannot be declared void for lack of capacity.

"This Court's primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue." *Parktown Imports, Inc. v. Audi of Am., Inc.*, 278 S.W.3d 670, 672 (Mo. banc 2009); *see also State ex rel. Jackson v. Dolan*, 398 S.W.3d 472, 479 (Mo. banc 2013) ("'[W]ords should be given their plain and ordinary meaning whenever possible.'"). "Other rules of statutory interpretation, which are diverse and sometimes conflict, are merely aids that allow this Court to ascertain the legislature's intended result." *Parktown Imports, Inc.*, 278 S.W.3d at 672. Courts look elsewhere for interpretation only when the meaning is ambiguous or would lead to an illogical result that defeats the purpose of the legislation. *State ex rel. Jackson*, 398 S.W.3d at 479.

"The rules of statutory interpretation are not intended to be applied haphazardly or indiscriminately to achieve a desired result." *Parktown Imports, Inc.*, 278 S.W.3d at 672. "Instead, the canons of statutory interpretation are considerations made in a genuine effort to determine what the legislature intended." *Id.* Statutory interpretation should not

20

be hyper-technical, but reasonable and logical and should give meaning to the statute. *Id.* at 673. In addition, when the legislature construes its own language by providing definitions, that construction supersedes the commonly accepted dictionary or judicial definition, and it is binding on the courts. *State ex rel. Jackson*, 398 S.W.3d at 479.

Smith argues in favor of invoking the canon of construction that the expression of one thing implies the exclusion of another—that is, the General Assembly, by stating several means of declaring a beneficiary designation void, intended to exclude incapacity as a means of voiding a beneficiary designation. As support, Smith cites the court of appeals' decision, *In re Estate of Goldschmidt*, 215 S.W.3d 215 (Mo. App. 2006), which adopted this rationale. In *Goldschmidt*, the court of appeals addressed whether the circuit court erred in not allowing an amendment to the petition. *Id.* at 223. The amendment would have asserted a claim of mental incapacity, among other claims. *Id.* The court of appeals held that "[t]he legislature's express mention of fraud, duress, undue influence, and murder . . . as reasons for voiding a POD account imply that it did not intend the additional claims in this case be deemed causes for remedial action."[14] *Id.* at 224.

Smith's argument, and the court of appeals' rationale in *Goldschmidt*, ignores the plain meaning of several provisions of the Nonprobate Transfers Law, including the requirement that "beneficiary designations" be governed by "applicable law." Section 461.005(2), RSMo Supp. 2013. The Nonprobate Transfers Law generally allows persons to transfer property at death outside of probate proceedings through another person or

---

[14] The court of appeals has also held, by the same logic, that the legislature did not intend unilateral mistake to be a basis for challenging a beneficiary deed. *Groh v. Ballard*, 965 S.W.2d 872, 874 (Mo. App. 1998).

entity, without some of the formalities required for wills. Sections 461.001, 461.009, RSMo 2000. A nonprobate transfer is defined as "a transfer of property taking effect upon the death of the owner, pursuant to a beneficiary designation." Section 461.005(7), RSMo Supp. 2013. A beneficiary designation is defined as follows:

> a provision in writing that is not a will that designates the beneficiary of a nonprobate transfer, including the transferee in an instrument that makes the transfer effective on death of the owner, and that complies with the conditions of any governing instrument, the rules of any transferring entity **and applicable law**.

Section 461.005(2), RSMo Supp. 2013 (emphasis added). Section 461.012, RSMo 2000, recognizes that "a nonprobate transfer is a matter of agreement between the owner and the transferring entity" in the following two circumstances, among others: (1) when the governing instrument requires submission of a beneficiary designation or (2) when the transferring entity requires registration of a transfer-on-death direction on a certificate or record evidencing ownership.

Here, the nonprobate transfers were made pursuant to (1) beneficiary designations on Watson's accounts and pension and (2) transfer-on-death directions on the certificates of title for several of her vehicles. Therefore, all of the nonprobate transfers and the beneficiary designations themselves are "matters of agreement."[15] Section 461.012, RSMo 2000. Accordingly, the creation of each beneficiary designation is governed by

---

[15] These agreements would have been created between Watson and the "transferring entities." These transferring entities were several financial institutions with respect to her accounts; CALSTRS with respect to her pension; and state vehicle licensing departments with respect to her vehicles. *See* Mo. Dep't of Revenue, *Miscellaneous Titling Information*, § 7 at 1-2 (last visited June 19, 2014), *available at* http://dor.mo.gov/pdf/Section7.pdf. A copy of this document has been placed in this Court's file.

the "applicable law" of contracts. Section 461.005(2), RSMo Supp. 2013. Under the common law, a contract is deemed void if a party lacks the requisite mental capacity at the time of contracting—meaning mental capacity must be present for a contract to exist at all. *See McElroy v. Mathews*, 263 S.W.2d 1, 10-11 (Mo. 1953).

The legislature's listing of several ways in § 461.054, RSMo 2000, to declare a beneficiary designation void does not mean it intended to impliedly abrogate the common law requirement of contractual capacity for beneficiary designations. *See State ex rel. Smith v. Greene*, 494 S.W.2d 55, 59 (Mo. banc 1973) (stating that this Court will not be persuaded that the legislature abrogated common law doctrine absent some clear legislative intent to do so). To the contrary, the General Assembly specifically incorporated the common law and other statutes relating to property transfers by reference to "applicable law." Section 461.005(2), RSMo Supp. 2013. Mental capacity is required to make a contract. *McElroy*, 263 S.W.2d at 10-11. Therefore, mental capacity is required to make a beneficiary designation.[16] To the extent *In re Estate of*

---

[16] This Court has reached a similar conclusion with regard to an analogous statute. "In construing a statute it is appropriate to take into consideration statutes involving similar or related subject matter when such statutes shed light upon the meaning of the statute being construed . . . ." *Cook Tractor Co. v. Dir. of Revenue*, 187 S.W.3d 870, 873 (Mo. banc 2006). Section 362.470, RSMo 2000, which governs joint deposits, states that making a deposit in the name of two or more people as joint tenants is conclusive evidence that title vests in the survivor "in the absence of fraud or undue influence." One might argue, as Smith has done here, that the legislature intended to exclude mental incapacity as a basis for voiding a joint deposit account. However, this Court in *Fix v. Fix*, 847 S.W.2d 762, 765 & n.2 (Mo. banc 1993), stated that § 362.470, RSMo 2000, was intended to incorporate a prior decision of this Court and stated that ownership of a joint deposit account vests in the survivor not only in the absence of fraud and undue influence but also in the absence of mental incapacity and mistake. *See also In re Estate of Meyer*, 744 S.W.2d 844, 847 (Mo. App. 1988) (holding that a depositor did not create a joint tenancy under § 362.470 because she lacked mental capacity).

23

*Goldschmidt*, 215 S.W.3d 215 (Mo. App. 2006), is inconsistent with this opinion, it should no longer be followed.

**IV.   The Circuit Court's Error in Applying the Testamentary Capacity Standard to Beneficiary Designations and Other Property Transfers Was Not Prejudicial**

Because the mental capacity required to make a contract is different from that required to make a will or trust, the circuit court misapplied the law of testamentary capacity to the beneficiary designations and other property transfers.   However, the mental capacity required to make a contract is higher than the mental capacity required to make a will or trust, which is the testamentary capacity standard applied by the circuit court. *See McElroy*, 263 S.W.2d at 10 ("Greater mental capacity is required to make a contract when dealing at arm's length and which contract embraces matters requiring mature consideration and reflection, than is required to make a will or gift conveyance."); *see also* § 431.055, RSMo 2000 (stating that a person must be at least 18 years of age to make a contract).   Therefore, the circuit court's error was not prejudicial.   *See* Rule 84.13(b)

As discussed, changes to beneficiary designations are matters of contract.   The same is true of the other during-life property transfers.[17]   Accordingly, each of these

---

[17] These changes to beneficiary designations and property transfers included the following: in December 2007 and January 2008, Watson retitled her checking and money market accounts from the trust to herself individually, and Smith was named as the pay-on-death beneficiary; she used funds from a CD owned by the trust to create a new savings account in her own name, with Smith as beneficiary; and she changed the beneficiary designations on two of her IRAs in favor of Smith; on July 24, 2008, Smith submitted a form to CALSTRS reducing Watson's during-life benefits from her pension and allocating a survivor share to Smith as the sole surviving beneficiary; in October 2008, Watson used funds from one of her IRAs to create a new IRA, which also named Smith as the beneficiary; and in December 2008, for each of Watson's vehicles, she added Smith as either a joint title holder or a transfer-on-death beneficiary.

24

transactions is governed by the standard for contractual capacity, not the standard for testamentary capacity. *See McElroy*, 263 S.W.2d at 10 (reciting the contractual capacity standard); *see also In re Estate of Marquis*, 822 A.2d 1153, 1156-57 & n.4 (Me. 2003) (holding that contractual capacity, not just testamentary capacity, is required for changes to beneficiary designations on annuity contracts and clarifying that the same is true of life insurance policies); *SunTrust Bank, Middle Ga., N.A. v. Harper*, 551 S.E.2d 419, 424-26 (Ga. Ct. App. 2001) (holding that the contractual capacity standard, not the testamentary capacity standard, applies to beneficiary designations on IRAs).

Just as there was substantial evidence in the record for the circuit court to conclude that Watson lacked testamentary capacity when she signed the amendments to her trust, the record also supports the conclusion that she lacked capacity regarding the changes to the beneficiary designations and property transfers. Dr. Sky testified that Watson lacked testamentary capacity at all points after July 1, 2007. As mentioned previously, this testimony as well as other evidence in the record supports the conclusion that Watson lacked capacity after July 1, 2007. *See Lewis*, 413 S.W.2d at 505; *Ambruster*, 244 S.W.2d at 72. Accordingly, the circuit court necessarily concluded that she could not have met the higher standard of contractual capacity each time she changed beneficiary designations or transferred property out of the trust in favor of Smith. *See McElroy*, 263 S.W.2d at 10. Therefore, substantial evidence supports the circuit court's judgment that all changes to beneficiary designations and property transfers after July 1, 2007, were void.

25

**V.    The Circuit Court's Judgment Was Not Against the Weight of the Evidence**

Smith's final claim is that the circuit court's judgment that Watson lacked capacity was against the weight of the evidence. Appellate courts act with caution in exercising the power to set aside a decree or judgment on the ground that it is against the weight of the evidence. *JAS Apartments, Inc. v. Naji*, 354 S.W.3d 175, 182 (Mo. banc 2011). "[A] claim that the judgment is against the weight of the evidence presupposes that there is sufficient evidence to support the judgment." *In re J.A.R.*, 426 S.W.3d at 630. In other words, "weight of the evidence" denotes an appellate test of how much persuasive value evidence has, not just whether sufficient evidence exists that tends to prove a necessary fact. *See White v. Dir. of Revenue*, 321 S.W.3d 298, 309 (Mo. banc 2010) (stating that "weight" denotes probative value, not the quantity of the evidence). The against-the-weight-of-the-evidence standard serves only as a check on a circuit court's potential abuse of power in weighing the evidence, and an appellate court will reverse only in rare cases, when it has a firm belief that the decree or judgment is wrong. *See JAS Apartments, Inc.*, 354 S.W.3d at 182.

When reviewing the record in an against-the-weight-of-the-evidence challenge, this Court defers to the circuit court's findings of fact when the factual issues are contested and when the facts as found by the circuit court depend on credibility determinations. *See Pearson v. Koster*, 367 S.W.3d 36, 43-44 (Mo. banc 2012); *White*, 321 S.W.3d at 307-09. A circuit court's judgment is against the weight of the evidence only if the circuit court could not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment. *See Pearson*, 367 S.W.3d at

26

43-44; *White*, 321 S.W.3d at 307-09. When the evidence poses two reasonable but different conclusions, appellate courts must defer to the circuit court's assessment of that evidence. *In re J.A.R.*, 426 S.W.3d at 626, 632 n.14; *Pearson*, 367 S.W.3d at 43-44; *White*, 321 S.W.3d at 307-09.

This Court defers on credibility determinations when reviewing an against-the-weight-of-the-evidence challenge because the circuit court is in a better position to weigh the contested and conflicting evidence in the context of the whole case. *In re J.A.R.*, 426 S.W.3d at 626. The circuit court is able to judge directly not only the demeanor of witnesses, but also their sincerity and character and other trial intangibles that the record may not completely reveal. *Id.* at 627 Accordingly, this standard of review takes into consideration which party has the burden of proof and that the circuit court is free to believe all, some, or none of the evidence offered to prove a contested fact, and the appellate court will not re-find facts based on credibility determinations through its own perspective. *Id.*; *Pearson*, 367 S.W.3d at 43-44. This includes facts expressly found in the written judgment or necessarily deemed found in accordance with the result reached. Rule 73.01(c); *In re J.A.R.*, 426 S.W.3d at 626. Evidence not based on a credibility determination, contrary to the circuit court's judgment, can be considered in an appellate court's review of an against-the-weight-of-the-evidence challenge.

Smith takes issue with the fact that the circuit court adopted the Ivies' proposed findings of fact and conclusions of law. He also argues that the evidence that Watson lacked testamentary capacity was too remote from the dates of execution, and he argues that the testimony of Young and the deposition testimony of Vandivort prove that Watson

had testamentary capacity when she made the changes to her estate plan. "While trial courts must act independently in making findings of fact and conclusions of law, it is not error for a trial court to request or receive proposed findings and, in appropriate cases, to adopt those findings." *State v. Weaver*, 912 S.W.2d 499, 522 (Mo. banc 1995). In addition, whether Watson had testamentary capacity each time she made a change to her estate plan was a contested factual issue at trial. The circuit court was free to draw the reasonable conclusion, based on the evidence presented, that Watson did not have testamentary capacity at each time period at issue. With due regard and deference to the circuit court's credibility determinations as explained in the judgment, and having considered all the evidence contrary to the judgment, this Court is not firmly convinced that the finding of lack of capacity is against the weight of the evidence.

Watson showed signs of paranoia as early as January 2003 when a physician noted that Watson thought Smith was poisoning her. She persisted in this belief, and her mental condition progressively worsened leading up to the date of the first trust amendment on July 27, 2007. Her problems with memory were recited in her medical records by Smith, Watson herself, and her physicians and nurses. A physician diagnosed her with dementia in 2005, and by March 2006, she had forgotten even the devastating event of her daughter's murder. The following November, she was diagnosed with Alzheimer's dementia. By May 2007, she did not recognize her brother's children and other previously known family members.

Hospital records showed that on June 25, 2007, roughly one month before signing the first trust amendment, she was "confused" and "oriented to self only." She was non-

28

responsive to the nurses' attempts to orient her "to time and place," and she made inappropriate statements suggesting impaired memory. The treating physician confirmed her dementia diagnosis and recommended increasing her medication as well as further treatment. The circuit court could reasonably conclude from this evidence that Watson lacked testamentary capacity to make the first trust amendment.

In November 2007, in-home nursing service records noted Watson's continued problems with paranoia, forgetfulness, and mood swings. In January 2008, Smith noted a slew of mental deficiencies on an intake form at the physicians' office. The circuit court was also free to conclude from this evidence that Watson lacked capacity to make each of the changes to her accounts in December 2007 and January 2008.

Watson's medical records showed that she continued to be confused and forgetful, and she had mood swings and delusions leading up to the second trust amendment. Throughout her stay in the nursing home in June 2008, she was frequently disoriented about where she was and about the time of day. And although Young again testified that Watson was aware of what she was doing on July 2, 2008, the day she left the nursing home and signed the second trust amendment, she was still disoriented as to time. Shortly thereafter, and before she changed the beneficiary designation on her CALSTRS pension or made any of the remaining changes to her estate plan, at least one physician stated that Watson was incapable of managing her estate, making decisions for herself, or understanding the nature of a contract. Affidavits from four other physicians would follow.

29

Even after consideration of evidence not deemed to lack credibility that was contrary to the circuit court's determination that Watson lacked testamentary capacity at the time of execution, it is clear the circuit court could have reasonably concluded that Watson lacked capacity each time she made a change to her estate plan. This Court defers to the circuit court's determinations that the Ivies' witnesses and evidence were persuasive and that Smith's witnesses and evidence were not. Therefore, the circuit court's judgment was not against the weight of the evidence.

## Conclusion

The circuit court's judgment that Watson lacked capacity to make the changes to her estate plan was supported by substantial evidence and was not against the weight of the evidence. Although the circuit court misapplied the law of testamentary capacity to the changes to beneficiary designations and other during-life property transfers, the error was not prejudicial because the applicable contractual capacity standard requires greater mental functioning than the testamentary capacity standard. Therefore, this Court affirms the circuit court's judgment.[18]

_____
Zel M. Fischer, Judge

All concur.

---

[18] Although the circuit court's judgment directed that the CALSTRS pension benefit go directly to the Ivies, it directed that the other non-trust assets go to her probate estate. Assuming those assets should have reverted to the trust or the Ivies directly instead of passing through probate, the effect is harmless because of the provision in Watson's will pouring her assets over into the trust. *See* § 456.021, RSMo Supp. 2013 (permitting pour-over wills).