

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| GLENN JAMES DUNCAN, JR., | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD83330 |
| | ) | |
| TITLEMAX OF MISSOURI, INC., | ) | Opinion filed:  August 25, 2020 |
| | ) | |
| Appellant. | ) | |

### APPEAL FROM THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI
### THE HONORABLE LOUIS ANGLES, JUDGE

Division One:  Thomas H. Newton, Presiding Judge,
Mark D. Pfeiffer, Judge and Edward R. Ardini, Jr., Judge

Glenn Duncan ("Duncan") filed suit in the Circuit Court of Clay County against TitleMax of Missouri, Inc. ("TitleMax") alleging conversion of his vehicle. TitleMax filed a Motion to Compel Arbitration and Stay Litigation ("Motion to Compel Arbitration"), which was denied by the trial court. TitleMax appeals from that denial. We affirm.

### I.     Factual and Procedural Background

On December 12, 2018, Travis Eacret ("Eacret"), Duncan's grandson, obtained a consumer loan from TitleMax using the title to a 2004 Pontiac Bonneville as security. The vehicle was co-owned by Eacret and Duncan. Eacret defaulted on the loan, and TitleMax repossessed the vehicle.

On May 10, 2019, Duncan filed a petition alleging conversion of the vehicle and seeking punitive damages. TitleMax filed a Motion to Compel Arbitration, alleging that Duncan had

accompanied Eacret to TitleMax on December 12, 2018, and had signed a Co-Owner's Consent that included an arbitration provision stating, in relevant part:

> Licensee has a policy of arbitrating all claims, demands, and disputes which cannot be resolved in a small claims tribunal, including the scope and validity of this Arbitration Agreement and any right Co-Owner may have to participate in an alleged class action (hereinafter, "dispute(s)"). Co-Owner agrees that The Federal Arbitration Act governs this arbitration provision.

The name Jim Duncan appears on the signature line with the date 12/12/18. In further support of its Motion to Compel Arbitration, TitleMax submitted an affidavit from the general manager of the Claycomo TitleMax store ("Manager"), which stated, in relevant part:

> A person who had accompanied Mr. Eacret to the Store on December 12, 2018, electronically signed the Co-Owner's Consent as "Jim Duncan." In accordance with the Store's general practice, TitleMax employees, including myself, always verify the identification of persons who execute Co-Owner Consent and Grant of Security Interest forms before those forms are signed. Thus, the Jim Duncan who signed the Co-Owner Consent at the Store on December 12, 2018, had his identity verified before doing so.

In his pleadings, Duncan denied having ever been to the TitleMax store and asserted that he "never signed anything[.]" In opposition to the Motion to Compel Arbitration, Eacret supplied an affidavit stating that Duncan did not accompany him to TitleMax on December 12, 2018:

> On or about December 12, 2018, I went to the TitleMax office in Claycomo, Missouri to obtain a loan on a 2004 Pontiac vehicle which I co-own with my grandfather, Glenn Duncan. . . . [Manager] told me that I had to have my grandfather come in and sign some papers. I told her that my grandfather would not sign. She went ahead and gave me the loan and told me to have my grandfather come in within the next few days and sign the paperwork or she would get into some real trouble. I went home and told my grandfather that I had gotten the loan money and he needed to go up and sign the papers. He told me he wasn't going to sign any papers.
>
> . . . My grandfather was never at TitleMax on the day I got the loan and I did not nor did anybody with me have my grandfather's identification.
>
> . . . Several days later [Manager] called me and asked to talk to my grandfather. She talked to him and I heard him tell her that he wasn't going to sign any papers.

2

The trial court denied TitleMax's Motion to Compel Arbitration, memorializing the denial in a docket entry. TitleMax appeals from that denial.[1]

## II.    **Standard of Review**

Issues concerning the arbitrability of a dispute are reviewed *de novo* "because '[w]hether a dispute is covered by an arbitration provision is relegated to the courts as a question of law.'" *Theroff v. Dollar Tree Stores, Inc.*, 591 S.W.3d 432, 436 (Mo. banc 2020) (quoting *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003)). We also review *de novo* whether there exists an enforceable delegation clause within an arbitration agreement. *Id*.

If there is a factual dispute about whether an arbitration agreement exists, the trial court "shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party; otherwise, the application shall be denied. § 435.355.1, RSMo.[2] "'[I]ssues relating to the existence of an arbitration agreement are factual and require our deference to the trial court's findings.'" *Baier v. Darden Restaurants*, 420 S.W.3d 733, 736 (Mo. App. W.D. 2014) (quoting *Katz v. Anheuser-Busch, Inc.*, 347 S.W.3d 533, 539 (Mo. App. E.D. 2011)). "As such, in an appeal from a circuit court's order overruling a motion to compel arbitration when there is a dispute as to whether the arbitration agreement exists, the circuit court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Theroff*, 591 S.W.3d at 436. When no factual findings are made by the trial court, the facts "shall be considered as having been found in accordance with the result reached." Rule 73.01(c).[3]

---

[1] An order denying a motion to compel arbitration is appealable under section 435.440, RSMo. *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 773 (Mo. banc 2014).

[2] Statutory references are to the Missouri Revised Statutes, updated through the 2018 supplement.

[3] Rule references are to the Missouri Supreme Court Rules (2019).

III. **Discussion**

TitleMax raises three points on appeal, all asserting that the trial court erred in denying its Motion to Compel Arbitration. In its first point, TitleMax alleges that, because Duncan did not specifically challenge the delegation provision, "threshold questions of arbitrability should have been referred to the arbitrator[.]" In its second point, TitleMax claims that the trial court's order was not supported by substantial evidence, and in Point III, TitleMax asserts that the trial court's order was against the weight of the evidence. We address each point in turn.

### *Point I – Delegation Provision*

In Point I, TitleMax claims that the trial court "erred by refusing to compel arbitration because the Arbitration Agreement contained a broad delegation provision, reserving all threshold disputes about the formation, existence, scope, and validity of the Arbitration Agreement for the arbitrator to decide, which Duncan never specifically challenged."

"Parties can agree to arbitrate 'gateway' questions of 'arbitrability,' including whether the parties have agreed to arbitrate a given controversy." *Theroff*, 591 S.W.3d at 439 (citing *State ex rel. Newberry v. Jackson*, 575 S.W.3d 471, 474 (Mo. banc 2019)). "Contractual arrangements to arbitrate gateway questions of arbitrability occur when the parties include a 'delegation provision' in the arbitration agreement." *Id*. (citing *Rent-A-Ctr, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010)). "'[A] delegation provision is an additional, severable agreement to arbitrate threshold issues that is valid and enforceable unless a specific challenge is levied against the delegation provision.'" *Id*. (quoting *State ex rel. Pinkerton v. Fahnestock*, 531 S.W.3d 36, 50 (Mo. banc 2017) (additional citation omitted)). When determining whether the parties have agreed to delegate threshold issues of arbitrability, "'[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clea[r] and unmistakabl[e] evidence that they did so.'" *Id*. (quoting

*Fahnestock*, 531 S.W.3d at 43; *Rent-A-Ctr., W., Inc.*, 561 U.S. at 69 n.1).

TitleMax argues that Duncan was required to specifically challenge the validity of the delegation provision and his failure to do so necessitated the trial court, as a matter of law, to compel arbitration for resolution by the arbitrator of threshold issues of arbitrability. It is true that Duncan did not specifically challenge the delegation provision. Instead, the gravamen of Duncan's argument is that he did not execute the Co-Owner's Consent or the arbitration agreement contained therein. In other words, Duncan challenges the *existence* of the arbitration agreement between him and TitleMax. Thus, it was not necessary for Duncan to specifically challenge the delegation provision as a "challenge to the existence of the mutual agreement in its entirety because of a lack of assent necessarily challenges the existence of any delegation provision it contains." *Theroff*, 591 S.W.3d at 439.[4] As a result, we reject TitleMax's premise that Duncan's failure to specifically challenge the delegation provision required the trial court to give effect to that provision by compelling arbitration and permitting threshold disputes to be addressed by the arbitrator.

Resolution by the trial court of Duncan's challenge to the existence of an agreement to arbitrate between himself and TitleMax was a prerequisite to compelling arbitration. *See* § 435.355.1, RSMo; *Theroff*, 591 S.W.3d at 439 ("To the extent *Newberry*, *Soars*, and *Pinkerton* can be read to suggest one can be forced into arbitration by a contract to which one is a stranger, this interpretation is incorrect."). Thus, it was proper for the trial court to address Duncan's claim that no arbitration agreement existed between him and TitleMax as any delegation to the arbitrator

---

[4] In *Theroff*, a blind employee claimed that she did not read or sign an arbitration agreement included in her new-hire paperwork, arguing that, although the document included her electronic signature, she was not able to see the document on the computer screen when she signed and another employee who was helping her did not mention or explain that an arbitration agreement existed in the paperwork. 591 S.W.3d at 435. The circuit court agreed, and overruled the employer's motion to compel arbitration. *Id.* at 439. On appeal, our Supreme Court affirmed, abrogating prior case law such as *Newberry* and *Pinkerton*, and clarifying that "[a] court should determine if the contract in question falls within the coverage of the arbitration act *before* applying the act's severability principle, requiring a challenge to an arbitration agreement, or delegation provision, separate from a challenge to the overall contract." *Id.* at 440 (emphasis in the original).

was necessarily dependent on such an agreement. *See Theroff*, 591 S.W.3d at 437 ("Unlike the standard scenario in which there is no dispute about whether a party signed an arbitration agreement, when a party disputes signing, the court must first decide the existence of an agreement to arbitrate.").

Point I denied.

### *Points II and III – Existence of an agreement to arbitrate*

In Point II, TitleMax challenges whether there was substantial evidence supporting the trial court's order denying the Motion to Compel Arbitration. In Point III, TitleMax claims that the trial court's denial of the motion was against the weight of the evidence.

"'[A]rbitration is a matter of contract, and parties will be compelled to arbitrate their claims only if the arbitration agreement satisfies the essential elements of a valid contract.'" *Jiminez v. Cintas Corp.*, 475 S.W.3d 679, 683 (Mo. App. E.D. 2015) (quoting *Marzette v. Anheuser-Busch, Inc.*, 371 S.W.3d 49, 52 (Mo. App. E.D. 2012)). As stated above, "when a party disputes signing, the court must first decide the existence of an agreement to arbitrate." *Theroff*, 591 S.W.3d at 437. "Without a valid agreement to arbitrate, the trial court cannot compel a party to arbitrate a dispute." *Baier*, 420 S.W.3d at 737 (citation omitted). The party seeking to compel arbitration has the burden of proving that there existed an agreement to arbitrate. *Gemini Capital Group, LLC v. Tripp*, 445 S.W.3d 583, 588 (Mo. App. S.D. 2013) (citation omitted).

### *Substantial evidence supported the denial of the Motion to Compel Arbitration*

TitleMax claims in Point II that substantial evidence did not support the trial court's order denying its Motion to Compel Arbitration. "[A] substantial evidence challenge argues that 'there is no evidence in the record tending to prove a fact that is necessary to sustain the [trial court's] judgment as a matter of law.'" *Cityview Real Estate Servs., LLC v. K.C. Auto Panel, Inc.*, 576

S.W.3d 187, 191-92 (Mo. App. W.D. 2019) (quoting *Ivie v. Smith*, 439 S.W.3d 189, 200 (Mo. banc 2014)). "Substantial evidence is evidence that, if believed, . . . has any tendency to make a material fact more or less likely." *Ivie*, 439 S.W.3d at 199.

TitleMax argues that "Duncan failed to offer admissible—or any—evidence demonstrating that he did not sign the Co-Owner's Consent" asserting that Eacret's affidavit "carries no probative value as to whether or not Duncan actually signed the Co-Owner's Consent." Noting the lack of an affidavit or testimony from Duncan, TitleMax speculates that perhaps Duncan signed the agreement "outside of Mr. Eacret's presence or otherwise without Mr. Eacret's knowledge that he had done so."

In addressing TitleMax's hypothetical claim that Duncan may have signed the Co-Owner's Consent without Eacret's knowledge, it deserves reminding that the affidavit submitted by TitleMax stated that "[a] person who had accompanied Mr. Eacret to the Store on December 12, 2018, electronically signed the Co-Owner's Consent as 'Jim Duncan.'" Thus, under the factual scenario urged by TitleMax, Duncan accompanied Eacret to the TitleMax store on December 12, 2018, and it was at that time that he electronically signed the Co-Owner's Consent. Eacret's affidavit unequivocally refuted TitleMax's claim that Duncan "had accompanied" him to the store stating that "[m]y grandfather was never at TitleMax on the day I got the loan[.]"

The Eacret affidavit provided substantial evidence that Duncan was not present at the TitleMax store on December 12, 2018, and therefore did not electronically sign the Co-Owner's Consent, as alleged by TitleMax, on that date, and the trial court's reliance thereon was not error. *See Theroff*, 591 S.W.3d at 437 (citation omitted) ("The outcome of this case turns on the circuit court's factfinding role[.] . . . When the parties challenge facts relevant to a particular issue, as they did here, this Court will defer to the circuit court's assessment of the evidence."). Simply

7

stated, the trial court disbelieved TitleMax's evidence, which it was entitled to do. *See Ivie*, 439 S.W.3d at 200 (additional citations and quotations omitted) ("Circuit courts are free to believe any, all, or none of the evidence presented[,]" and we "accept as true the evidence and inferences . . . favorable to the trial court's decree and disregard all contrary evidence."); *see also Theroff*, 591 S.W.3d at 439 ("By ruling in [Duncan's] favor and overruling the motion to compel arbitration, the circuit court, after reviewing all the evidence, impliedly found there was no agreement."). The trial court's denial of the Motion to Compel Arbitration was supported by substantial evidence.

Point II denied.

*The denial of TitleMax's Motion to Compel Arbitration*
*was not against the weight of the evidence*

In Point III, TitleMax asserts that the trial court's denial of its Motion to Compel Arbitration was against the weight of the evidence. "'[A] claim that the judgment is against the weight of the evidence presupposes that there is sufficient evidence to support the judgment.'" *Ivie*, 439 S.W.3d at 205 (quoting *In re J.A.R. v. D.G.R.*, 426 S.W.3d 624, 630 (Mo. banc 2014)). "The against-the-weight-of-the-evidence standard serves only as a check on a circuit court's potential abuse of power in weighing the evidence, and an appellate court will reverse only in rare cases, when it has a firm belief that the decree or judgment is wrong." *Id*. at 206. "A circuit court's judgment is against the weight of the evidence only if the circuit court could not have reasonably found[ ] from the record . . . the existence of a fact that is necessary to sustain the judgment." *Id*.

Here, there was ample evidence before the trial court that Duncan did not sign the Co-Owner's Consent containing the Arbitration Agreement. As explained in our analysis of Point II, TitleMax's theory was that Duncan accompanied Eacret to the TitleMax store on December 12, 2018, and electronically signed the Co-Owner's Consent at that time. Eacret's affidavit directly contradicted this evidence by asserting that Duncan was not present at the TitleMax store on that

8

day. Moreover, the assertion by TitleMax's Manager stating it was store policy to check the identification of anyone signing a Co-Owner's Consent and, therefore, Duncan's identification was checked[5] was similarly contradicted by Eacret who stated that no one with him at the TitleMax store on that date was in possession of Duncan's identification documents.

TitleMax's argument essentially asks us to disregard our standard of review and reweigh the evidence in its favor. Such an approach is not proper in an against the weight of the evidence challenge. *See Ivie*, 439 S.W.3d at 206 ("This Court defers on credibility determinations when reviewing an against-the-weight-of-the-evidence challenge because the circuit court is in a better position to weigh the contested and conflicting evidence in the context of the whole case."). As the trial court could reasonably have found that Duncan was not present at the TitleMax store on December 12, 2018, and did not sign the Co-Owner's Consent, this Court rejects TitleMax's argument that the trial court's ruling was against the weight of the evidence.

Point III denied.

## IV.    Conclusion

The circuit court's order denying TitleMax's Motion to Compel Arbitration is affirmed.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.

---

[5] On the issue of identification verification, the affidavit of TitleMax's Manager stated that "[i]n accordance with the Store's general practice, TitleMax employees, including myself, always verify the identification of persons who execute Co-Owner's Consent and Grant of Security Interest forms before those forms are signed. Thus, the Jim Duncan who signed the Co-Owner Consent at the Store on December 12, 2018, had his identity verified before doing so." A close reading of the affidavit reveals that the Manager never directly asserted that Duncan himself was at the store or that she or any other employee actually performed an identification verification related to the relevant Co-Owner's Consent. Rather, the affidavit simply concludes that the Jim Duncan who signed the Co-Owner's Consent had his identify verified because that is the store's practice.