A01A0105, A01A0106. SUNTRUST BANK, MIDDLE GEORGIA,
N.A. et al. v. HARPER; and vice versa.

(551 SE2d 419)

PHIPPS, Judge.

SunTrust Bank, Middle Georgia, N.A. (SunTrust), as custodian of an individual retirement account (IRA) and as issuer of a joint savings account, filed a complaint for interpleader and declaratory judgment to seek adjudication of conflicting claims to the IRA and to the certificate of deposit (CD). SunTrust named as defendants Michael D. Harper and SunTrust, as the executor and trustee under the terms of Harper's father's will.[1] On summary judgment, the trial court found against SunTrust as executor as to the IRA account but in favor of SunTrust as the executor as to the CD. After review, we reverse the judgment as to the IRA and affirm as to the CD.

SunTrust and William Earl Harper executed an IRA agreement on March 12, 1984, in which Mr. Harper designated his spouse as sole beneficiary. According to the terms of the IRA account, "if no designated beneficiary survives the Depositor, payment shall be made to the Depositor's estate." At the time of Mr. Harper's death in July 1997, his wife had predeceased him by several years. When SunTrust filed suit, the amount in the IRA custodial account was in excess of $341,645.

On July 3, 1996, William Earl Harper's son, Michael D. Harper, and Roberta Smith filed a petition for the appointment of a guardian for an alleged incapacitated adult seeking creation of a guardianship for Mr. Harper. The petitioners claimed, inter alia, "[t]he proposed Ward has a considerable estate and is the trustee of a trust under the last will and testament of his deceased wife. He is currently incapable of making investment decisions regarding either estate and has been incapable of filing tax returns for 1995." According to the petition, the duration of the incapacity would be "permanent." The petition sought appointment of Michael D. Harper as the guardian of the

---

[1] Harper and the estate of his father were asserting adverse claims to the IRA and the CD. The Commercial Department of SunTrust occupied a position of uncertainty, not knowing whether to distribute the proceeds to Harper or to the estate, whose interest the Trust Department of SunTrust was obligated to represent as executor and trustee under Harper's father's will.

person and property of William Earl Harper. A statement of income and assets disclosed that Mr. Harper was the owner of real and personal property in excess of $3,000,000.

The Probate Court of Bibb County appointed a licensed psychologist to evaluate Mr. Harper. After conducting a hearing pursuant to OCGA § 29-5-6 (d), and based on all the evidence including the psychological report, the probate court granted the guardianship petition, finding that "William Earl Harper is in need of the appointment of a guardian of his person and property." In the order filed on August 26, 1996, the probate court found that he:

> is incapacitated by reason of mental disability to the extent that William Earl Harper lacks sufficient understanding or capacity to make significant, responsible decisions concerning his person and property and to manage his estate. Specifically, the Court finds that William Earl Harper suffers from an advanced dementia of the Alzheimer's type, which is permanent and characterized by disorientation, confusion and poor memory, and is unable to formulate and communicate rational, informed decisions concerning his person or property.

The probate court ordered a permanent guardianship and expressly removed from Mr. Harper the following powers:

> the power to contract marriage; the power to make contracts; the power to consent to medical treatment; the power to establish a residence or place of abode; the power to bring or defend any action at law or equity (except an action relating to guardianship) except through a guardian ad litem; the power to buy, sell or otherwise dispose of or encumber real, personal or trust property; and the power to enter into any other business or commercial transaction.

The probate court did not remove Mr. Harper's power to make a will or perform an independent determination of Mr. Harper's testamentary capacity.[2] Nevertheless, the probate court directed his guardian "to file the ward's will with the Clerk of this Court for safekeeping." Under that Last Will and Testament executed in November 1991, Mr. Harper appointed Trust Company Bank of Middle Georgia, N.A., now SunTrust, as executor and trustee. Under this will, Mr. Harper devised and bequeathed his entire estate to his children, "share and share alike, or if any such child or children be deceased, to his

---

[2] See OCGA § 29-5-7 (f).

descendants, per stirpes." While the petition for guardianship was pending, Cullen, Mr. Harper's only child other than Michael, died on August 6, 1996. Cullen was survived by two children, Shane and Jason Harper, whose interests SunTrust as executor and trustee now represents.[3]

About a month after the probate court declared his father mentally incapacitated and named him permanent guardian, Michael Harper drove his father to a branch office of SunTrust. There, on September 24, 1996, notwithstanding the probate court's finding that "he lacks sufficient understanding or capacity to make significant, responsible decisions," Mr. Harper proceeded to execute a document to change the beneficiary on his IRA. With this change, upon Mr. Harper's death, all proceeds of the IRA would no longer go to the estate but solely to Michael Harper.

Mr. Harper died on July 14, 1997, at the age of 78. In December 1997, SunTrust as custodian of the IRA filed the underlying lawsuit after SunTrust, on behalf of the estate, claimed the IRA proceeds and Michael Harper, as the designated beneficiary on the IRA, claimed them for himself. SunTrust later amended its action to include allegations concerning a CD to which Mr. Harper had added Michael Harper's name on April 5, 1996, to create a joint account for "William E. Harper or Michael D. Harper." This change in the ownership of the CD transpired less than three months before the petition was filed seeking the permanent guardianship for Mr. Harper.

The parties filed cross-motions for summary judgment. SunTrust as executor contended that the transactions changing the name of the beneficiary of the IRA and adding Michael Harper's name to the CD should not be recognized as valid and that the proceeds of both accounts should be paid into the estate of William Earl Harper for distribution under the terms of the will to be shared equally between Michael Harper and the estate.[4] Michael Harper claimed that notwithstanding his mental infirmity, his father had experienced a "lucid interval" during which he "was possessed of the requisite mental capacity necessary to effectuate his intention when he named his son Michael as the beneficiary of his IRA."

Ultimately, the trial court awarded the proceeds of the IRA to Michael Harper based on a conclusion that "the change in beneficiary was testamentary rather than contractual in nature and therefore valid." The court found, "[b]ecause the power to make a will was not removed by the Probate Court, the beneficiary change was a valid

---

[3] After their father died, William Shane Harper and Jason Cullen Harper filed an objection to Michael Harper's appointment as guardian of the property.

[4] Without the changes, all funds remaining in the IRA and the CD would have been paid to the estate upon Mr. Harper's death.

exercise of this power."

As to the joint CD, the trial court determined that Michael Harper had breached a fiduciary duty imposed by the guardianship. Noting that the law requires a guardian to disclaim any interest in the ward's property, regardless of when the guardianship is established, the trial court found that Harper had failed to do so. The court found:

> In the case at bar, while the joint CD was in full force [at] the time of the appointment, Michael Harper, once appointed, had a fiduciary duty to relinquish his interest in the CD. However, this was not the case. In addition to his failure to reveal the joint nature of the CD to the Probate Court and his failure to relinquish that interest, he also spent a total of approximately $147,000 out of three accounts to care for his father and nothing out of the joint CD account. [Cit.] Therefore, Michael Harper both in theory and in practice violated his fiduciary duty.

The trial court decided that Michael Harper was estopped from claiming sole ownership of the CD and awarded judgment to Sun-Trust as executor. On behalf of the estate, SunTrust appeals the adverse ruling on the IRA, and by cross-appeal, Michael Harper appeals the adverse ruling on the CD.

### Case No. A01A0105

SunTrust contends that the trial court erred when it ruled that an incapacitated adult, whose power to contract had been removed, could thereafter validly amend an IRA beneficiary designation so as to name his appointed guardian as beneficiary of the funds. As executor, SunTrust also contends that the same conflict of interest rule that the trial court applied to determine the ownership of the CD should be applied to the IRA which would have been distributed to the estate but for the change of beneficiary designation.

When a question of law is at issue, as here, we owe no deference to the trial court's ruling and apply a plain legal error standard of review.[5] And, where it is apparent that the trial court's judgment rests upon an erroneous legal theory, a reviewing court cannot affirm.[6] This is just such a case.[7]

The account at issue, the IRA, was a transaction created under

---

[5] *Suarez v. Halbert*, 246 Ga. App. 822, 824 (1) (543 SE2d 733) (2000).

[6] *Gwinnett County v. Davis*, 268 Ga. 653, 655 (492 SE2d 523) (1997).

[7] See generally *Wood v. Dan P. Holl & Co.*, 169 Ga. App. 839, 841 (2) (315 SE2d 51) (1984) (trial court's reliance upon erroneous legal theory requires reversal).

and governed by federal statute, and general principles of contract and banking law are also implicated. Under the terms of the agreement entitled "Individual Retirement Custodial Account," entered into between William Earl Harper and Trust Company Bank in 1984, Mr. Harper deposited certain funds "to provide for his/her retirement and for the support of his/her beneficiaries upon his/her death," and SunTrust agreed to act as the custodian of those funds. This contract consists of two pages of very fine print. On the bottom of the second page, the document states, "[t]his agreement shall be binding upon the parties hereto, their heirs, executors, administrators and successors, and shall be construed in accordance with the laws of the State of Georgia. IN WITNESS WHEREOF, the Depositor and the Custodian have executed and sealed this Agreement, on the date and year first above written."

When the probate court ordered the guardianship of Mr. Harper's person and property, the court removed not only Mr. Harper's power to contract but also "the power to buy, sell or otherwise dispose of . . . personal or trust property." Mr. Harper also forfeited "the power to enter any other business or commercial transaction." Having been adjudicated mentally incompetent to manage his property or his person, as a matter of law, as of August 26, 1996, Mr. Harper could no longer make contracts or manage his personal property. Plainly, in light of the explicit terms of the probate court order governing the guardianship, Mr. Harper could not have created a new IRA since he no longer had the power either to make contracts or to enter into any business or commercial transaction. Nor could Mr. Harper have made a partial withdrawal of funds from the existing IRA since he lacked the power to otherwise dispose of personal property. By statute,

> [a]fter the fact that a person is insane, mentally ill, mentally retarded, or mentally incompetent to the extent that he is incapable of managing his estate has been established by a court of competent jurisdiction in this state and the affairs of such person are vested in a guardian, the power of such person to contract, even though restored to sanity, shall be entirely gone; any contracts made by such person shall be absolutely void until the guardianship is dissolved.[8]

Thus, after the probate court found Mr. Harper was incapable of managing his estate and established the guardianship, Mr. Harper lacked all contractual capacity, and any contract entered into by him

---

[8] OCGA § 13-3-24 (b).

was absolutely void.[9]

Under the general principles of contract law, a person who is mentally incompetent cannot change the beneficiary of a life insurance contract.[10] As has been the law for more than a century,

> If the act of changing the beneficiary in the policy of insurance be done by the person whose life was insured, at a time when he is legally unable to contract, then, though it be done with the assent of the company and in the manner prescribed in the contract, this change in its terms will have no binding force, and the original contract will remain intact.[11]

We see no reason for a different rule here. In deciding to designate a different beneficiary, Mr. Harper made a material change to the terms of the agreement. Because Mr. Harper no longer had the power to contract, we find that he no longer had the power to modify the contractual terms of the IRA by changing the beneficiary.

This holding squarely comports with state banking law. To avoid the potential for conflicts to arise between provisions inserted in wills disposing of bank accounts and those appearing in banking agreements, this Code specifies that "a P.O.D.[12] payee designation cannot be changed by will."[13] The Code also provides that "[a]ny transfers resulting from the application of Code Section 7-1-813 ['Rights of survivorship'] are effective by reason of the account contracts involved in this article and are not to be considered as testamentary."[14] Accordingly, Mr. Harper could not have changed the designation of the beneficiary of this IRA by means of his last will and testament but had to do so under the terms of his agreement with the bank and in compliance with the principles of the law of contracts.[15] But after entry of the probate court order, he lacked the power to do so.[16]

To avoid the application of state banking law and contract principles, Michael Harper argues that his father's change of beneficiary

---

[9] See *Ga. Power Co. v. Roper*, 201 Ga. 760, 761 (1) (41 SE2d 226) (1947).

[10] *Cason v. Owens*, 100 Ga. 142 (28 SE 75) (1897) (naming beneficiary is a material part of a life insurance contract).

[11] Id. at 145 (1).

[12] OCGA § 7-1-810 (10) defines a "P.O.D. account" to mean "an account payable on request to one person during his lifetime and on his death to one or more P.O.D. payees or to one or more persons during their lifetimes and on the death of all of them to one or more P.O.D. payees."

[13] OCGA § 7-1-813 (e).

[14] OCGA § 7-1-815.

[15] Federal statutory law codified in the Internal Revenue Code defines an individual retirement account as a "trust." 26 USC § 408 (a). Even if this IRA is considered an express trust, Mr. Harper no longer had the power "to otherwise dispose of . . . trust property."

[16] See *Caldwell v. Walraven*, 268 Ga. 444, 447, n. 7 (490 SE2d 384) (1997).

on the IRA was testamentary in nature and that despite the guardianship, his father had the requisite testamentary capacity at the time he made the change. Harper contends that changing the beneficiary on an IRA should be viewed as a testamentary act or testamentary in nature since it disposes of property at death. He claims that SunTrust failed to meet its burden of showing by clear and convincing evidence that his father suffered from a total deprivation of reason at the time the change in beneficiary form was executed. But this line of argument is flawed because Mr. Harper was not changing his will but was attempting to change the disposition of a nonprobate asset.[17] While it is true that the creation of a guardianship for an incapacitated adult does not automatically remove that adult's power to make a will,[18] the capacity to contract, not to make a will, became at issue.

Statutory and case law have long distinguished between the power to make contracts and the power to make a will. The mental capacity needed to make a contract is greater than that required to make a valid will.[19] For that reason, a person may create a valid will at age 14 but may not enter into a contract until the age of majority.[20] In fact, statutory law also recognizes that "[a]n incapacity to contract may coexist with [a] capacity to make a will."[21] A greater quantum or higher degree of mentality is required to make a contract than to make a will.[22] Consequently, the capacity to contract and testamentary capacity have very distinct legal meanings.

Without question, on September 24, 1996, the date that the change to the IRA agreement was made, Mr. Harper no longer had the power to make contracts or to otherwise dispose of personal or trust property and could no longer enter into any other business or commercial transaction. When Mr. Harper changed the disposition of the funds in the account, his capacity to contract, not his testamentary capacity, became at issue. Since Mr. Harper no longer had the power to modify any of the contractual provisions governing his retirement account, including changing the designated beneficiary, the trial court erred as a matter of law in finding otherwise.[23] In light of this holding, we need not decide whether by being named the sole

---

[17] See Radford, Redfearn's Wills & Administration in Georgia (6th ed.), § 2-8. According to this treatise, "[t]he most common arrangements that result in non-probate transfers of assets are: life insurance policies, retirement plans, joint tenancy ownership of property, payable on death bank accounts and trust accounts, transferable on death security registration, and inter vivos trusts." Id. at p. 35.

[18] *Pope v. Fields*, 273 Ga. 6, 8-9 (2) (536 SE2d 740) (2000); see OCGA § 29-5-7 (f).

[19] *Smith v. Davis*, 203 Ga. 175, 185 (6) (45 SE2d 609) (1947).

[20] See OCGA §§ 53-4-10; 13-3-20.

[21] OCGA § 53-2-21, now codified at OCGA § 53-4-11 (b).

[22] *Anderson v. Anderson*, 210 Ga. 464, 472 (80 SE2d 807) (1954).

[23] See *Davis*, supra, 268 Ga. at 655.

beneficiary of the IRA proceeds, Michael Harper, as guardian and fiduciary, became placed in a clear conflict of interest position.

## Case No. A01A0106

In the cross-appeal, Michael Harper contends that the trial court erred by granting summary judgment to SunTrust as executor of his father's estate on the question of the ownership of the CD. Notwithstanding Harper's contention to the contrary, the trial court correctly applied the law governing conflicts of interest by a fiduciary.[24] "The law will not permit a guardian to act in such a way that his own personal interest may come in conflict with the interest of his ward with respect to the estate of the latter in his charge."[25] A guardian owes a duty of undivided loyalty to his ward and must not place himself in a position where his own personal interests conflict or may conflict with the interests of his ward.[26] The purpose of this loyalty rule is to ensure that a ward receives the unbiased and uninfluenced judgment of his guardian and to eliminate even a hint of suspicion as to the guardian's actions.[27] Since this loyalty rule is a preventative measure, "[i]t is not necessary that the guardian shall have gained from the transaction, in order to find that he is disloyal. If the dealing presented [a] conflict of interest and consequent temptation to the guardian, equity will provide a remedy at the option of the ward or his estate regardless of gain or loss to the guardian."[28]

Here, because Michael Harper asserted a joint interest in the CD along with his ward, he undoubtedly occupied a conflict of interest position. As we held in both *Moore* and *Dowdy*, if Michael Harper intended to claim title to the CD held in his name and his father's, and he admitted as much in his deposition, then he should not have applied for and accepted appointment as guardian. Although the trial court expressly found that Harper breached his fiduciary duty by failing to disclose his interest in the CD to the probate court and by preserving the funds in this CD at the expense of other accounts, even without these findings, the result would be the same because by accepting appointment as guardian, Harper breached the duty of undivided loyalty owed to his ward.[29] A guardian like a trustee must avoid being placed in a conflict of interest position. If he cannot do so, he may resign, may fully inform the probate court of the conflict, or

---

[24] See *Moore v. Self*, 222 Ga. App. 71, 73 (2) (473 SE2d 507) (1996).

[25] *Allen v. Wade*, 203 Ga. 753 (1) (48 SE2d 538) (1948).

[26] *Dowdy v. Jordan*, 128 Ga. App. 200, 204-205 (196 SE2d 160) (1973).

[27] *Moore*, supra, 222 Ga. App. at 73 (2).

[28] (Citation and punctuation omitted.) Id. at 74.

[29] See OCGA § 24-4-26; *Home Ins. Co. v. Wynn*, 229 Ga. App. 220, 222 (1) (493 SE2d 622) (1997).

may request that the court appoint a different guardian.[30] By not doing so, Harper proceeded at his own peril. Having violated the loyalty rule, Harper became estopped under the principles of fiduciary law from asserting any claim to the property adverse to the interest of the estate.[31] This does not preclude Harper from otherwise claiming an interest in this property under the terms of the will.[32]

Michael Harper argues that the rule of deterrence set forth in *Moore* and *Dowdy* should be overruled in light of changes made to state banking law that now accommodate will substitutes. He claims that by operation of banking law, he should have received all of the funds in the joint account under OCGA § 7-1-813 (a), since "sums remaining on deposit at the death of a party to a joint account belong to the surviving party . . . as against the estate of the decedent, unless there is clear and convincing evidence of a different intention at the time the account is created." He argues that absent a showing of actual wrongdoing, he should not have to forfeit his entitlement to monies that his father clearly intended for him to have upon his death. We cannot agree.

OCGA § 7-1-813 (a)'s creation of a rebuttable presumption of ownership by the surviving party actually gives rise to an even greater need for the rule of deterrence as the facts here demonstrate. As part of the sworn petition submitted to the probate court, Michael Harper provided a statement of income and assets "of the proposed ward." The section describing the ward's assets held as personal property lists:

| | |
|---|---|
| Checking account — Bank SunTrust (JT) | $ 30,000 |
| Savings account — Bank SunTrust Money Market (JT) | $500,000 |
| Certificate of Deposit — Bank SunTrust | $100,000 |
| Other items SunTrust IRA | $275,000 |

A notation at the bottom of this page explains, "JT — joint account for convenience with Michael D. Harper." Nothing on the face of this statement reporting the assets of William Earl Harper would have apprised the probate court or Shane and Jason Harper that Michael Harper was claiming he had a joint ownership interest in the CD.

In their objection filed with the probate court, Shane and Jason Harper opposed Michael Harper's appointment as guardian of the property. In seeking appointment of SunTrust as guardian, they noted, "William Earl Harper has his checking account, savings/money market account of one-half million dollars ($500,000), certificate of deposit of $100,000, and an IRA of one-fourth million dollars ($250,000) at SunTrust Bank, and Mr. Harper has 22,918 shares of

---

[30] *Wynn*, supra, 229 Ga. App. at 222.

[31] *Scoggins v. Strickland*, 265 Ga. 417 (1) (456 SE2d 208) (1995).

[32] *Parnelle v. Cavanaugh*, 191 Ga. 464, 465-466 (2) (12 SE2d 877) (1941).

SunTrust stock in his portfolio." Again, no evidence shows that Michael Harper advised his nephews, their counsel, or the probate court that he believed that the CD belonged to him and not his proposed ward, notwithstanding his deposition testimony on June 16, 1999, long after Mr. Harper's death, that his father had made a gift of the CD to him.

Probate Court Judge William J. Self II testified as follows:

> The fact that the accounts in question [checking, money market, and CD] were disclosed to the court as assets *of the ward*, especially given the explanatory legend, causes me to believe and state that Michael D. Harper, the proposed guardian, did not then assert any claim to the joint account funds or otherwise assert claims which were adverse to the interests of his proposed ward. Further, the fact that all such accounts were obviously included in my calculation of the bond which I required the guardian to post, indicates to me that I then considered all such accounts to be solely owned by the ward.

(Emphasis in original.) To avoid the conflict of interest situation, Michael Harper could have sought to serve solely as guardian of his father's person. Had Harper wanted to claim an ownership interest in the CD that was adverse to the estate, at a minimum, he should have timely disclosed his purported interest in that CD to the probate court.[33] This he failed to do.

*Judgment reversed in Case No. A01A0105. Judgment affirmed in Case No. A01A0106. Smith, P. J., and Barnes, J., concur.*

DECIDED JULY 2, 2001 — ▌

*Jones, Cork & Miller, Hubert C. Lovein, Jr.*, for appellants.
*Martin, Snow, Grant & Napier, Thomas P. Allen III, William H. Larsen, Harris & James, Sarah S. Harris*, for appellee.

---

[33] See *Wynn*, supra, 229 Ga. App. at 222.