**FIFTH DIVISION**
**MILLER, P. J.,**
**RICKMAN and MARKLE, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**March 12, 2019**

# In the Court of Appeals of Georgia

A18A1792. LAW v. THE STATE.

RICKMAN, Judge.

William Law, Jr. was indicted on 100 counts of criminal conduct related to his financial oversight of his elderly mother's affairs. At trial, he was convicted on 12 of those counts: Count 2 - exploitation of a disabled adult; Count 3 - perjury; Count 4 - using a false document; and Counts 92-100 - nine counts of theft by taking. For the reasons that follow, we affirm.

Construed in favor of the verdict, the facts as developed at trial show that in late 2006, Law's 88-year old mother was diagnosed with Alzheimer's disease, and two year's later, Teresa, Law's sister, who had been managing their mother's finances and held her power of attorney, died; Teresa and her husband had three children. After a few months during which Teresa's husband, who succeeded to holding the

power of attorney, managed the mother's affairs, Law told his brother-in-law that he did not want his brother-in-law involved with his mother's affairs; and Law's attorney informed the brother-in-law "that [his] services weren't needed any more." At that time, in addition to various real property and some stock investments, Law's mother's bank accounts were worth in excess of $350,000. By this time, Law's mother's mental condition had deteriorated to "moderate dementia." Law then ordered that his mother was not allowed to leave the house with anyone other than him, he banned his brother-in-law and a niece from visiting, and he took control of his mother's finances. Law's second sister, Beverly, who had a son, died suddenly some time thereafter but prior to her mother's death.

On February 11, 2009, Law's mother executed a new durable power of attorney making Law her attorney in fact; a new will, naming Law as the executor of her estate; and an advanced directive for healthcare, naming Law as her agent therein. The prior will distributed real property to each of her three children, and it divided the remainder of the estate equally among her children and their descendants. The new will removed all references to individual properties, but it provided that the remainder of the estate would pass in one-third shares to her children or to the "lineal descendants" of any deceased child. Shortly after becoming his mother's attorney in

2

fact, Law's name was added to three of his mother's bank accounts, and he opened another account in their joint names.

Two years later, Law's mother was diagnosed with "severe dementia" and assessed as not competent to handle her own affairs. During this time, Law drove his mother to an attorney's office where she signed a gift deed to Law transferring title to her personal residence (while retaining a life estate). She also cancelled a security deed associated with a $46,550 loan to Law. Four months after that, Law moved his mother to a long-term memory care facility because she required 24-hour care. Law then rented out his mother's residence and, while his mother was still alive, kept the rent money for himself. Law also instructed the employees at the facility to prohibit his brother-in-law and a granddaughter from visiting without prior approval from Law and to call the police if they did, which occurred on one occasion.

On August 29, 2011, Law filed a verified Petition for Appointment of Guardian and/or Conservator (the "Petition"), for his mother and her assets, on the ground that she had "severe dementia." The Petition failed to list lineal descendants as required by law.[1] The Petition also failed to disclose that Law previously "[had] been

[1] Law was required to list "all living children, if any, whose addresses are known. If there are no living adult children whose addresses are known, then list at least two adults in the following order of priority: lineal descendants of the proposed

3

nominated to serve under a . . . durable power of attorney for healthcare. . . or other instrument that deals with the management of the person of the proposed ward" or that he "[had] been nominated to serve under a power of attorney, . . . or other instrument that deals with the management of the property of the proposed ward in the event of incapacity." The Petition also failed to disclose, as required, that Law had conflicts of interest in that he co-owned joint accounts and certain real property with his mother. And page 12 of the petition, which required Law to list all of his mother's assets, was not included in the filing. The State presented further evidence that all of the information in the Petition came from Law and that he was asked to confirm that the information was true, accurate, and correct. In fact, Law verified the facts set forth in the Petition.

Shortly thereafter, the probate court granted the Petition and found that Law's mother was in need of a guardian and a conservator, that she had no assets, and that Law was her sole heir. Given that there were no assets listed in the Petition, the

ward. . . ." See also OCGA §§ 29-4-10 (b) (7) (C) (i); 29-5-10 (b) (8) (C) (i); see also Black's Law Dictionary (10th ed. 2014) (a lineal descendant is "[a] blood relative in the direct line of descent. Children, grandchildren, and great-grandchildren are lineal descendants."). In his testimony, Law stated that "lineal descendants' meant those "who [are] the closest people to [his mother]." He then testified that he thought that his mother's nieces had a closer link to his mother than her grandchildren, and that is why he listed the nieces.

4

probate court issued letters of guardianship and conservatorship to Law without requiring a bond.[2] Under the letters of guardianship and conservatorship, Law was instructed to act in his mother's best interest and to separate her funds from his own; he was also prohibited from selling her property or spending her money without a court order.

The State presented significant detailed evidence showing that during the years that Law held his mother's power of attorney, as well as during the short time that he was his mother's guardian and the conservator of her assets, he transferred tens of thousands of dollars from his mother's accounts to his own and spent a large percentage of the money on his own personal expenses. Law's mother died on January 13, 2012.

As a result, Law was eventually indicted and charged in three groups of counts. In Counts 1 and 2, he was charged with exploitation of an elder person and exploitation of a disabled adult, respectively, both violations of former OCGA § 30-5-8 (effective: June 3, 2010 to June 30, 2012). In Counts 3 and 4, he was charged with perjury (OCGA § 16-10-70) and filing a false document (OCGA § 16-10-20), in that

---

[2] "A conservator appointed by the court shall give bond with good and sufficient security." OCGA § 29-5-40 (c).

in August 2011, he made a false statement and used a false document in connection with filing the Petition. And in Counts 5 through 100, Law was charged with 96 counts of theft by taking, with each count representing a different date on which Law allegedly took funds from his mother while acting as her fiduciary.

Law was acquitted of exploitation of an elder but convicted of exploitation of a disabled adult (Count 2). He was convicted of both perjury and filing a false document in connection with the Petition (Counts 3 and 4). And he was convicted on nine counts of theft by taking for transactions that occurred between August 31, 2011 and his mother's death, in other words, all transactions after he filed the Petition to be appointed as guardian and conservator of his then mentally disabled mother. Law was acquitted of all other charges of theft by taking.

1. In his first two enumerations of error, Law contends the trial court erred by denying his motion to quash/special demurrer to Counts 2 and Counts 92-100. "We review rulings on special demurrers de novo." *State v. Leatherwood*, 326 Ga. App. 730, 731 (757 SE2d 434) (2014). When we review rulings on special demurrers after trial, "we consider whether the defendant suffered actual prejudice from alleged deficiencies in the indictment." *Herring v. State*, 334 Ga. App. 50, 52 (778 SE2d 57) (2015); see also *Mitchell v. State*, 282 Ga. 416, 419 (4) (651 SE2d 49) (2007). Here,

Law has not attempted to show any such harm or prejudice and we see none; these enumerations are therefore without merit. See, e.g., *Mitchell*, 282 Ga. at 419 (4) ("Neither appellant has shown how he was misled to his prejudice by any alleged imperfection in the indictment and we can discern no prejudice in either record. Any error in failing to try appellants upon a "perfect" indictment was, thus, manifestly harmless.").

2. Law contends the trial court erred by failing to dismiss prospective jurors for cause who indicated that they were biased. "Whether to strike a juror for cause is a matter committed to the sound discretion of the trial court, and we will not find error in an exercise of that discretion absent a showing that the discretion was manifestly abused." *Carter v. State*, 302 Ga. 685, 686 (2) (808 SE2d 704) (2017).

During the voir dire, Law's counsel informed the court that "based on the [large] number of counts [in] the Indictment, a great number [in fact, seven] of the [prospective] jurors indicated that they would actually presume [Law] guilty in this case." Law therefore asked the court to strike those jurors for cause. In response, the court instructed the prospective jurors that "the defendant is presumed to be innocent until proven guilty by the State beyond a reasonable doubt" and that the indictment was not evidence and should not be considered evidence. The court then asked

7

whether any of the prospective jurors could not follow these instructions, to which no one responded. The court therefore declined to excuse any of the seven jurors. We find no error.

"In order to disqualify a juror for cause, it must be established that the juror's opinion was so fixed and definite that it would not be changed by the evidence or the charge of the court upon the evidence." (Citations and punctuation omitted.) *Carter v. State*, 252 Ga. 502, 506 (8) (315 SE2d 646) (1984). Thus, here, where the jurors indicated that they could follow instructions about the presumption of innocence, burden of proof, and the fact that the indictment was not evidence, the trial court did not abuse its discretion by declining to excuse the jurors for cause. See *Sadat-Moussavi v. State*, 313 Ga. App. 433, 435 (721 SE2d 647) (2011) (trial court did not err in refusing to strike juror who initially stated that she believed the defendant was guilty in light of the indictment, after she altered her position and expressed ability to remain fair and impartial after being given information about the nature of the indictment and the burden of proof).

3. Law contends the trial court erred by refusing to admit evidence of the reasons why the State prosecuted the case against him.

While questioning the State's investigating officer, defense counsel attempted to introduce evidence of a memorandum drafted by attorneys retained by the victim's estate, which, according to counsel, represented "the beginning of the investigation into William Law." The State objected on the grounds that the document was hearsay, could not be authenticated, and violated a court ruling about not introducing evidence from a related civil case. The court sustained the State's objection. On appeal, Law fails to offer any legal argument to overcome the hearsay objection or the other two grounds asserted below for excluding the evidence. Accordingly, we deem the argument abandoned. See Court of Appeals Rule 25 (c) (2) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned."); see also *Duncan v. State*, 346 Ga. App. 777, 784 (3) (815 SE2d 294) (2018).

4. Law contends the evidence was insufficient to support the conviction of exploitation of a disabled adult (Count 2), see former OCGA § 30-5-8, or the nine counts of theft by taking (Counts 92-100), see OCGA § 16-8-2; he focuses solely on the question of his criminal intent. "On appeal from a criminal conviction, the defendant is no longer entitled to a presumption of innocence and we therefore construe the evidence in the light most favorable to the jury's guilty verdict."

9

(Citation and punctuation omitted.) *Maddox v. State*, 346 Ga. App. 674, 675 (816 SE2d 796) (2018).

Law's sole argument is that Georgia law was somewhat vague at the time about whether a person holding a durable power of attorney had the authority to use that power to give himself gifts from the principal's property and that, therefore, he had a basis to conclude that he could rightly do so. Specifically, he argues,

> Thus, it must be concluded that the confusing and highly individualistic decisional regime for evaluating the propriety of the way in which powers were utilized during the time period of the Appellant's alleged criminal conduct afforded him and others similarly situated very little guidance as to whether they could lawfully partake of their principals' property during their service as holders of such instruments. The seemingly broad powers set forth in the document executed by Mrs. Law for that reason gave Mr. Law at least a minimally plausible basis for believing that he could make gifts from his mother's estate to himself so long as she continued to have enough money to meet her recurring financial obligations.

He contends, therefore, that any possible criminal intent is negated by his reasonable belief that he was authorized to make himself gifts of his mother's property.

But Law was convicted of crimes that occurred after he filed the Petition to become his mother's guardian and the conservator of her estate. And the law was very

10

clear at the time that a guardian's fiduciary duty to his ward prohibited him from even putting himself in a position where his personal interests might conflict with his mother's:

> The law will not permit a guardian to act in such a way that his own personal interest may come in conflict with the interest of his ward with respect to the estate of the latter in his charge. A guardian owes a duty of undivided loyalty to his ward and must not place himself in a position where his own personal interests conflict or may conflict with the interests of his ward. The purpose of this loyalty rule is to ensure that a ward receives the unbiased and uninfluenced judgment of his guardian and to eliminate even a hint of suspicion as to the guardian's actions.

(Citations and punctuation omitted.) *SunTrust Bank, Middle Georgia N.A. v. Harper*, 250 Ga. App. 300, 307 (551 SE2d 419) (2001); see also OCGA § 29-5-22 (a) ("A conservator shall at all times act as a fiduciary in the ward's best interest and exercise reasonable care, diligence, and prudence."). Thus, even asserting a joint interest in an account belonging to his ward put Law in a conflict-of-interest position thereby breaching the duty of undivided loyalty he owed to his ward. See *Harper*, 150 Ga. App. at 307 (where guardian asserted a joint interest in a CD along with his ward, he breached the duty of undivided loyalty); OCGA § 29-5-2 ("No person may be appointed or continue to serve as conservator of the estate of an adult who . . . has a

11

conflict of interest with the adult unless the court determines that the conflict of interest is insubstantial or that the appointment clearly would be in the adult's best interest."). In addition, Law was issued letters of guardianship and conservatorship by the Probate Court which directed that he act in his mother's best interest; that he keep his mother's funds separate from his own; and that he was specifically prohibited from selling, giving away, or otherwise disposing of any of his mother's property without a court order.

Also, "[a] joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent." OCGA § 7-1-812. This Code section "creates a presumption that a party funding a joint account does not intend to make a gift of the funds of the account during her life, but that the presumption is subject to rebuttal by clear and convincing evidence of a contrary intent." (Citation and punctuation omitted.) *Howard v. Leonard*, 330 Ga. App. 331, 338 (2) (b) (765 SE2d 466) (2014). Whether there is a contrary intent is a question of fact. Id.

Finally, it is well-established that "[c]riminal intent is a question for the jury and may be inferred from conduct before, during and after the commission of the

crime." (Citation and punctuation omitted.) *Glenn v. State*, 279 Ga. 277, 277-278 (1) (612 SE2d 478) (2005).

Here, the State presented evidence suggesting that Law isolated his mother from other family members, took control of her life and finances, and personally gained from doing so to the detriment of the beneficiaries of the 2009 will. Evidence was presented to show that Law concealed required information on the Petition, such as that he failed to list lineal descendants, that he under-reported her assets, and that he failed to reveal his conflicts of interest to the probate court. The State also presented extensive evidence of a pattern of transactions whereby Law, while he was a guardian and conservator, wrote checks or executed transfers from his mother's individual account to one of several joint accounts he held with his mother, and then transferred the same amount to an account bearing his name only. Law then used the money in his own account to pay his personal expenses.

In conclusion, the jury was presented sufficient evidence from which it could conclude that Law acted with guilty knowledge and criminal intent when taking funds from his mother's account, especially after he became her guardian and the conservator of her assets. See, e.g., *Amaechi v. State*, 306 Ga. App. 333, 336 (1) (702

SE2d 680) (2010) (jury may resolve questions of intent from circumstantial evidence). Accordingly, this enumeration of error is without merit.

5. Law contends that the trial court erred by failing to give the jury an instruction on the definitions of gift and undue influence. Law, however, did not propose any such charges, nor did he object to the failure of the court to give them. Because Law failed to object, we are precluded from reviewing this claim of error other than reviewing his contentions for plain error affecting the substantial rights of the parties. See OCGA § 17-8-58 (b).

> Plain error review involves four steps:

> First, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

(Citation, punctuation, and emphasis omitted.) *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011). "Satisfying all four prongs of this standard is difficult, as it should be." (Citation and punctuation omitted.) Id.

Here, pretermitting a determination of the other steps, Law has failed to show that any failure by the trial court to define the above terms affected his substantial rights. "To prevail on this step, appellant has the burden to make an affirmative showing that the error probably did affect the outcome below." (Citation and punctuation omitted.) *Hampton v. State*, 302 Ga. 166, 168 (2) (805 SE2d 902) (2017).

Here, the trial court's charge as a whole instructed the jury on the presumption of innocence, criminal intent, the requirement that the State prove every element of the crimes beyond a reasonable doubt, mere suspicion, and the definition of the relevant crimes. The court also instructed on the definition of exploitation, which includes the concept of undue influence, in connection with Counts 1 and 2:

> For the purposes of Counts One and Two, the term "exploitation" means the illegal or improper use of a disabled adult or elder person or that person's resources through undue influence, coercion, harassment, duress, deception, false representation, false pretense, or other similar means for one's own profit or advantage.

15

The court also instructed on the definition of theft by taking and fiduciary relationship for Counts 5 through 100. In connection thereto, the court charged on the defense to theft of "honest claim of right," as follows:

> It is a defense to a charge of theft by taking that the Accused person, (A) was unaware that the property was that of another, or (B) *acted under an honest claim of right to the property involved or under a right to acquire or dispose of it*. Should you find from the evidence in this case that the Accused acted under such claim of right as I have just instructed you, *then it would be your duty to acquit the defendant*. The burden of proof rests upon the State to prove beyond a reasonable doubt that the Accused did not act under an honest claim of right to the property and that the Accused was aware that the property was that of another. If the State fails to prove such beyond a reasonable doubt, then you should acquit the defendant.

(Emphasis supplied.)

When considered with the rest of the court's charge, this charge adequately allowed the jury to acquit Law for exploitation or for taking property of his mother based on a claim of gift, which is essentially the defense of "honest claim of right." Indeed, the jury in fact acquitted him of numerous counts of theft by taking. Thus he has not shown that the jury was not capable of determining guilt or innocence without further definition of a gift. With regard to "undue influence" the term was a part of

16

the definition of exploitation, and that definition contained enough context and detail to give the jury sufficient information to understand exploitation in connection with Counts 1 and 2. Moreover, the State obviously asserted that Law exploited his mother in other manners stated in the instruction, such as coercion or "other similar means for one's own profit or advantage." In sum, Law has not carried his burden of making an affirmative showing that lack of a definition of the terms in question probably affected the outcome below.

6. Law contends the trial court erred by failing to charge on mistake of fact as a defense to the counts of perjury and use of a false document in connection with filing the Petition.

The law of misapprehension/mistake of fact provides that a person cannot be found guilty of a crime "if the act or omission to act constituting the crime was induced by a misapprehension of fact which, if true, would have justified the act or omission." OCGA § 16-3-5. "Mistake of fact is a defense to a crime to the extent that the ignorance of some fact negates the existence of the mental state required to establish a material element of the crime." *Jones v. State*, 263 Ga. 835, 839 (2) (439 SE2d 645) (1994). "Generally, however, ignorance or mistake of fact constitutes a defense to a criminal charge only if it is not superinduced by the fault or negligence

17

of the party doing the wrongful act." (Citation and punctuation omitted.) *Hines v. State*, 276 Ga. 491, 495 (5) (578 SE2d 868) (2003). And "[e]ven where an accused's sole defense is mistake of fact, such charge is not required where it is not authorized by the evidence." *Taylor v. State*, 293 Ga. App. 551, 555 (3) (667 SE2d 405) (2008).

In Count 3, the State asserted that Law committed perjury, OCGA § 16-10-70, when he knowingly and willfully made a false statement in the Petition "when he failed to disclose all of [his mother's] personal assets and lineal descendants, and that he held Power of Attorney over [her] and joint ownership of her property." In Count 4, the State asserted that Law committed the offense of using a false document, OCGA § 16-10-20, for essentially the same reasons. In his defense, Law testified that he completely and correctly filled out the Petition, including page 12, and he implies that perhaps his attorney and his attorney's staff caused the omissions. He characterizes this problem as "mistaken conduct beyond his control" and he argues that he therefore was entitled to a charge on "misapprehension of fact."

Here, it is undisputed that Law reviewed and verified the accuracy of the information to be filed. Thus, if the document contained errors when he signed it, he superinduced those errors. See, e.g., *Taylor*, 293 Ga. App. at 555 (3) (any mistake by defendant regarding the authenticity of checks submitted to bank for payment were

18

superinduced by defendant's own negligence in failing to question the payor or examine the security features of the checks). Further, any mistake about what persons were his mother's lineal descendants is a mistake of law, and therefore does not require a charge on mistake of fact. See *Paul v. State*, 331 Ga. App. 560, 564 (4) (769 SE2d 396) (2015) ("[F]ailure to give a charge on mistake of fact is not error where the evidence shows that a party has made a mistake of law.").

Finally, even if a charge on mistake of fact should have been given, we find no reversible error because the court fully and adequately charged the jury regarding perjury and filing a false document and that each required knowing and willful action:

> [A] conviction generally should not be reversed in any case . . . where the charge of the court fully and adequately covers the requisite elements of the crime charged, the requirement of criminal intent to commit the crime charged, and other material defenses thereto, and where a reasonable trier of fact could find from the evidence proof of guilt beyond a reasonable doubt. This is so because where the jury has heard the defense and has been properly charged as to the state's burden of proof, the elements of the crime and the requirement of criminal intent, and as to material defenses, a finding of guilt necessarily finds the requisite criminal intent and therefore negates any possibility that the jury, had it been charged mistake of fact, would have acquitted.

(Citations and punctuation omitted.) *Hall v. State*, 258 Ga. App. 156, 158 (2) (573 SE2d 415) (2002); see also *Stillwell v. State*, 329 Ga. App. 108, 110 (1) (764 SE2d 419) (2014) (same).

The court instructed the jury, for both perjury and false filing, that the State had the burden of showing that Law "knowingly or wilfully" committed the crime. Thus, the jury was instructed on Law's defense that he did not know there were errors in the Petition or that he did not wilfully file the Petition with errors included.

For the above reasons, we find no reversible error.

*Judgment affirmed. Miller, P. J., and Markle, J., concur.*