

# Missouri Court of Appeals

### Southern District

### Division Two

| | | |
|---|---|---|
| DUNTON & ASSOCIATES, LLC, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. SD37092 |
| | ) | |
| A & J PRINTING INC., JIMMY L. | ) | **Filed: June 28, 2022** |
| EAKINS, and EAKINS PRESS, INC., | ) | |
| | ) | |
| Defendants-Respondents, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILLIAM DUNTON, LISA DUNTON, | ) | |
| and ABACUS CPAs, LLC, | ) | |
| | ) | |
| Third Party Defendants. | ) | |

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Michael J. Cordonnier

**AFFIRMED**

This appeal concerns the validity of a promissory note. Executed by the then-vice-president of Respondent A & J Printing, Inc. ("A&J" or "the corporation"), the note promised that A&J would pay Appellant, Dunton & Associates, LLC ("Dunton & Associates"), $200,000, with 6% annual interest, payable on demand ("the Note"). After a bench trial, the circuit court found the Note to be invalid because it was not supported by consideration.

1

In two points relied on, Dunton & Associates claims the circuit court erred by: (1) "determining that [the Note] was without consideration because 'there was no contemporaneous consideration exchanged'"; and (2) "refusing to pierce the corporate veil and hold [Respondent Jimmy Eakins ("Mr. Eakins")] personally liable for the debt[.]"

Because Dunton & Associates failed to persuade the circuit court that the Note was supported by consideration, the Note was invalid and could not be enforced against any person or entity. We therefore deny Appellant's first point and do not reach the second, which is rendered moot by our affirmation of the circuit court's conclusion that the Note was invalid.

### The Evidence[1]

Mr. Eakins formed A&J in the late 1960s, and he was its sole shareholder.[2] When Mr. Eakins wanted to retire, he asked a friend of his, Kevin Bowling ("Mr. Bowling"), to help him sell the business. Mr. Bowling suggested that Mr. Eakins discuss the sale with an accountant, and he introduced Mr. Eakins to William Dunton ("Mr. Dunton"), who had an office across the hall from Mr. Bowling and operated Dunton & Associates.

After Mr. Eakins had been unsuccessful in trying to sell his business, Mr. Bowling and Mr. Dunton believed that they could handle the printing business and offered to purchase it from Mr. Eakins. Mr. Eakins accepted their offer and transferred all of his A&J stock from a charitable trust[3] to Mr. Dunton and Mr. Bowling in exchange for a promissory

---

[1] We view the evidence in the light most favorable to the circuit court's judgment, ***Ivie v. Smith***, 439 S.W.3d 189, 200 (Mo. banc 2014), and other evidence is cited only to provide context for the parties' arguments on appeal.

[2] Dunton & Associates also tried to hold Mr. Eakins and/or his new company, Eakins Press, liable for the Note on the ground that Mr. Eakins dominated the corporation such that piercing the corporate veil to make him personally liable for his alleged wrongdoing would be appropriate.

[3] Mr. Eakins had previously transferred his shares of A&J into a charitable trust.

note[4] in the amount of $1.5 million that was to be repaid in monthly installments of $10,746.60 over a period of twenty years. That note was secured by a Stock Purchase Agreement that would allow Mr. Eakins to repossess his shares if the buyers defaulted on the note.

After the sale, Mr. Dunton served as the president of A&J, Mr. Bowling was vice-president, and Dorothy Taylor ("Ms. Taylor") continued in her position as the secretary of the corporation. Mr. Bowling was slated to run the day-to-day business of A&J, while Mr. Dunton was supposed to provide his financial expertise and act generally like a "silent partner." In concurrence with the sale, A&J also began using Dunton & Associates as its accounting firm.

After Mr. Eakins left the business, A&J soon began to experience severe cash-flow problems that were heightened by the uncertainty that followed the 9/11 terrorist attacks. Suppliers familiar with Mr. Eakins gave the new owners less advantageous terms, often reducing their time-payment terms from Net 90 to Net 30,[5] which reduced A&J's ability to purchase paper.

Mr. Bowling and Mr. Dunton approached Mr. Eakins and told him that in order to keep A&J operating, all three of them needed to personally guarantee a bank loan the corporation would acquire from Old Missouri Bank ("OMB"). Mr. Eakins joined them in signing the personal guarantee. As an additional condition of the loan, A&J established checking accounts for payroll and general operations at OMB.

Despite the infusion of cash provided by the OMB loan, A&J continued to struggle and did not have enough money in its bank accounts to cover its operating costs. Mr.

---

[4] This is a separate promissory note from the one at issue in this appeal.
[5] A Net 90 term requires payment 90 days after the delivery of the supplier's invoice. Net 30 requires payment after 30 days.

Dunton continued his practice of taking checks made payable to A&J and depositing them into the old A&J bank accounts instead of putting them into the new accounts established at OMB. Mr. Dunton also established a line of credit for Dunton & Associates and began using it to fund the operation of A&J.

Mr. Dunton then wrote checks from the old bank accounts to pay for the line of credit that he had established through Dunton & Associates. To cover ongoing insufficient-funds checks, Mr. Dunton would write checks to A&J from Dunton & Associates for the exact amount of the A&J outgoing checks, use the Dunton & Associates line of credit to fund those checks, then take an immediate, corresponding re-payment from A&J.

Mr. Dunton continued to write checks from A&J bank accounts to Dunton & Associates and other vendors, knowing that there was not enough money in those accounts to cover those transactions. Mr. Dunton would also take checks payable to A&J and negotiate them through accounts unaffiliated with A&J. Mr. Dunton believed that these practices were the best alternative method of financing A&J because the business had limited cashflow and could not obtain credit on its own behalf.

Mr. Dunton knew that OMB would "float" the difference between what was contained in the A&J accounts and the amount of the check, then charge A&J the difference, plus a significant insufficient-funds fee. Mr. Dunton's check-floating scheme incurred bank fees for A&J of over $57,000 in 2004 and more than $33,000 in 2005. A&J financial statements -- prepared by Dunton & Associates -- appeared to treat these transfers from Dunton & Associates as capital contributions from Mr. Dunton as a shareholder of A&J.

The money from the OMB loan and Mr. Dunton's check-floating scheme proved insufficient to remedy A&J's financial problems. The corporation began to fall farther and

farther behind in paying its vendors, and those vendors began to limit the amount of materials that they would supply to A&J. Vendors stopped extending credit for those purchases, and after at least one of A&J's checks had "bounced," vendors would only deliver materials on a "cash-on-delivery" basis. OMB eventually told Ms. Taylor that the bank would no longer cover insufficient fund checks written by A&J, and, shortly thereafter, A&J payroll checks also began to bounce.

On June 18, 2005, Mr. Dunton approached Mr. Bowling with the Note and directed him to sign it on behalf of A&J. Mr. Dunton said, "I know you're aware that we have *given* money back and forth over the years, and we just need to do a -- an accountability of that. So if something ever happened to you or me, whose memory is not going to be there anymore, we can make sure that I get *my* money back, paid back." (Emphasis added.) Mr. Bowling signed the Note, which stated:

> FOR VALUE RECEIVED, . . . the principal sum of $200,000 ("Principal"), together with interest thereon at 6% per annum, payable in _____ installment of principal, in the amount of $_____ or on demand. Prepayment of the Note shall be permitted. The first monthly installment shall be due on _____ .

Mr. Bowling did not verify (or even know) how much A&J might actually "owe" Dunton & Associates, how much Mr. Dunton had actually put into A&J, where that money had come from, or what the money had been used to purchase or pay. Mr. Dunton did not sign the Note.

At the time the Note was signed, Dunton & Associates's trial exhibit #75 -- prepared by Dunton & Associates -- asserted that Dunton & Associates had transferred several hundred thousand dollars to A&J, $143,705.42 of which allegedly remained unpaid, but Mr.

5

Dunton believed that yet more money would need to be "loaned" by Dunton & Associates because the business "hadn't turned the corner."

Approximately two years after the Note was executed by Mr. Bowling on behalf of A&J, Mr. Eakins foreclosed on the Stock Purchase Agreement and reacquired his shares in A&J. Mr. Eakins then transferred most of the debt and assets of A&J to a new corporation he had created, Respondent Eakins Press, Inc. ("Eakins Press"). When Mr. Dunton attempted to collect on the Note from Eakins Press, Mr. Eakins refused to pay it, and he has consistently maintained that A&J does not owe any money to Dunton & Associates.

Despite the testimony of several expert witnesses, and a multitude of self-produced financial statements introduced into evidence by Dunton & Associates, the circuit court found no clear, persuasive record as to how much money, if any, A&J might owe to Dunton & Associates. Mr. Dunton testified that neither he nor Dunton & Associates provided any funds to A&J when the Note was signed, and he knew that the amount he claimed A&J owed Dunton & Associates did not equal $200,000. And although some testimony indicated that Dunton & Associates's accounting services were to be included in the Note, the services Dunton & Associates provided to A&J did not match the services outlined in Dunton & Associates's engagement letter, often included significantly overbilled sums, and were often delivered nearly a year after they were due.

Ms. Taylor had worked as A&J's corporate secretary since the early 1970s, and she was unaware that the Note had been created and executed. Ms. Taylor knew that Mr. Dunton had been putting money into the business, but she testified that he would then immediately take the same amount back out. To the best of her knowledge, that money had

6

never been treated as a loan, although she believed that the influx of cash it produced was necessary to continue A&J's operations.

A&J's corporate bylaws required that any debt incurred by the business be approved by a formal resolution of the board of directors, but no meeting was called and no formal resolution was passed to approve the execution of the Note.

## Standard of Review & Governing Law

> In a court-tried case, an appellate court must affirm the circuit court's judgment 'unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.' *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

*Empire Dist. Elec. Co. v. Scorse as Tr. Under Tr. Agreement Dated Nov. 17, 1976*, 620 S.W.3d 216, 224 (Mo. banc 2021).

> "'A promissory note is a written contract for the payment of money.' *Merz v. First Nat'l Bank,* 682 S.W.2d 500, 501 (Mo.App. E.D.1984). 'The basic elements of a contract are offer, acceptance and consideration.' *Beck v. Shrum,* 18 S.W.3d 8, 10 (Mo.App. E.D.2000)." *Luebbert v. Simmons,* 98 S.W.3d 72, 77 (Mo.App.2003). "Consideration exists where there is a detriment to the promisee or a benefit to the promisor." *Citibank (South Dakota), N.A. v. Wilson,* 160 S.W.3d 810, 813 (Mo.App.2005).

*Laas v. Wright*, 191 S.W.3d 93, 99 (Mo. App. S.D. 2006).

"In a suit on a note, the holder makes a prima facie case by producing a note admittedly signed by the maker and showing the balance due." *Misemer v. Freda's Rest. Inc.*, 961 S.W.2d 120, 121 (Mo. App. S.D. 1998).

## Analysis

Appellant's first point claims

> [t]he trial court erred by determining that [the Note] was without consideration because "there was no contemporaneous consideration exchanged," because a contemporaneous exchange of money is not necessary consideration for a promissory note, but instead [the Note] itself imports

7

consideration and a note may issue for either an antecedent debt or future funding, in that [Mr. Dunton] used [Dunton & Associates's] line of credit to fund a lot of [A&J's] expenses and [Dunton & Associates] also carried [A&J] for accounting fees, . . . which showed . . . $306,000.89 through July 18, 2005, the date of [the Note], and . . . $453,773.18 [in loans and invoices] as of that date, and both exhibits showed that [A&J] owed [Dunton & Associates] $143,705.42 as of that date.

Because the major premise of Appellant's argument is faulty,[6] and we must defer to the trial judge's credibility determinations, we disagree.

> When a party admits execution and delivery of a promissory note (as occurred here), the law imports a consideration; consequently, the holder of the note is not required to prove consideration. § 431.020; *Misemer* [ ]*,* 961 S.W.2d at 121[ ]; *MFA Inc. v. Dettler,* 817 S.W.2d 658, 666[ ] (Mo.App.1991). Even so, the statutory presumption that consideration exists is rebuttable. *Diversified Metal Fabricators, Inc. v. Blue Skies, Inc.,* 899 S.W.2d 556, 560[ ] (Mo.App.1995); *Dettler,* 817 S.W.2d at 666[ ]. Thus, a party who signs an instrument[7] but claims it is not supported by consideration can prevail by pleading and proving a lack or failure of consideration. *Rose v. Howard,* 670 S.W.2d 142, 145–46 (Mo.App.1984); *Ireland v. Shukert,* 238 Mo.App. 78, 177 S.W.2d 10, 16 [(Mo. App. K.C.D.] 1943). *See Misemer,* 961 S.W.2d at 121. . . . In addition, the question of whether the maker of a note overcame the presumption of consideration is an issue of fact. *Id.* at 122[ ].

**Hunt v. Smith**, 992 S.W.2d 303, 306 (Mo. App. S.D. 1999).

A&J first raised the issue of lack of consideration prior to trial in its response to Dunton & Associates's motion for summary judgment, then presented evidence on it at trial. In affidavits filed with the circuit court in support of Dunton & Associates's motion for summary judgment, Mr. Dunton and Mr. Bowling claimed that Dunton & Associates delivered consideration for the Note in the amount of $200,000. However, at trial, Mr. Dunton conceded that, "at the time [the Note] was signed, July 18th or thereabout of 2005,

---

[6] The circuit court found, as a matter of *fact*, that no contemporaneous consideration was given in exchange for the Note, but we find nothing in the record to support Appellant's claim that the circuit court believed, as a matter of law, that that particular fact, by itself, rendered the Note invalid.

[7] Here, A&J (after all of its shares were purchased by Mr. Dunton and Mr. Bowling) was the entity that signed the Note, but Dunton & Associates claims in this suit that Eakins Press, and/or Mr. Eakins, in his personal capacity, are also liable on the Note.

there was not a deposit of $200,000 into the business contemporaneous with the signing of [the Note]." Further, Ms. Taylor, A&J's secretary, did not know that the company had signed a promissory note. While she knew that Dunton & Associates had put money into A&J's accounts (and then took it back out), she had never heard it called a loan, and she could not put a dollar figure on it. Finally, there were no corporate minutes, board meetings, or other formalities that approved the execution of the Note.

Consistent with this testimony, the circuit court included the following in its findings of fact:

> The evidence was undisputed that at the time [the Note] was signed there was no contemporaneous consideration exchanged. However, it was not lost on the Court that on February 21, 2017, each [sic] [Mr. Dunton] and [Mr. Bowling] (past vice president of A&J and signer of the Note) each signed an Affidavit under oath, which was submitted to the Court in support of [Dunton & Associates's] Motion [for] Summary Judgment that stated: "Dunton & Associates, LLC delivered $200,000.00 to A&J Printing, Inc., as promised in the Note." The truth of that statement is not supported by the evidence.

Dunton & Associates argues that the consideration necessary to support a promissory note need not be contemporaneous but may consist of antecedent debt or future needs, both of which Dunton & Associates claims it provided to A&J in the form of accounting services and loans.[8] Dunton & Associates is correct in asserting that consideration supporting a promissory note need not be contemporaneous, but that principle of law does not help it in this case.

While Dunton & Associates claimed to have *loaned* A&J money in an unspecified amount that A&J had not repaid, perhaps in light of the recanted affidavits and the absence of a board meeting, corporate minutes, or any other formalities approving the execution of

---

[8] Dunton & Associates asserted during oral argument that the case should be remanded to the circuit court for a determination of exactly how much A&J owed Dunton & Associates, an amount it claimed was at least $143,705.42.

9

the Note, the circuit court did not believe that claim.[9] Instead, the circuit court credited the testimony of Danny Kenneth Mitchell ("Mr. Mitchell"), an expert A&J had hired to "try to determine the flow of funds through the business."

Mr. Mitchell testified that, due to Mr. Dunton's check-kiting practice, and the commingling of funds, Mr. Mitchell "didn't have an opinion as to the amount of money that might be owed, one way or the other[,]" other than to say it was *not* $200,000. He also estimated that Mr. Dunton's check-kiting was similar to a loan, but at an equivalent interest rate to A&J of 73%. Dunton & Associates also claimed that A&J owed it money for accounting services it had rendered to the corporation. However, after Dunton & Associates took over accounting services for A&J, Mr. Mitchell testified that its financial statements were "usually very tardy"; sometimes by almost one year, rendering them essentially worthless from a business standpoint.

The circuit court found that Dunton & Associates's accounting practices at A&J were so deficient that, while the money *might* have been a loan, the circuit court was not persuaded that the money was more likely a loan than a gift or additional capital contributions made by Mr. Dunton. In other words, the circuit court was persuaded that the evidence A&J presented at trial sufficiently rebutted the presumption that the Note was supported by consideration. That factual finding then led the circuit court to its legal conclusion that, "[a]bsent consideration [the Note] is illusory, and otherwise not enforceable." We defer to the circuit court's findings of fact on appeal. ***Clifford Hindman Real Est., Inc. v. City of Jennings***, 283 S.W.3d 804, 806 (Mo. App. E.D. 2009). Point 1 fails.

---

[9] While counsel for Dunton & Associates claimed at oral argument that the circuit court "did not like Mr. Dunton," it is apparent from the circuit court's judgment that it did not find Mr. Dunton credible.

As to the claim asserted in Point 2 – that the circuit court erred in refusing to pierce the corporate veil – the circuit court's finding that the Note was not supported by consideration moots the question of whether Mr. Eakins could be personally liable to pay it need not be addressed.

The judgment of the circuit court is affirmed.

DON E. BURRELL, J. – OPINION AUTHOR

GARY W. LYNCH, Senior Judge – CONCURS

JENNIFER R. GROWCOCK, J. – CONCURS